NO. 4-00-0568

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from 

Plaintiff-Appellee, ) Circuit Court of

) Champaign County

DEXTER ABDULLAH, a/k/a DEXTER MONROE, ) No. 99CF474

Defendant-Appellant. ) 

) Honorable

) John G. Townsend,

) Judge Presiding.

                                                                 

MODIFIED UPON DENIAL OF REHEARING

JUSTICE APPLETON delivered the opinion of the court:

A jury found defendant, Dexter Abdullah, guilty of armed robbery, a Class X felony (720 ILCS 5/18-2(a)(2), (b) (West 2000)).  The trial court adjudged him a "habitual criminal" under the Habitual Criminal Act (720 ILCS 5/33B-1 through 33B-3 (West 2000)) and sentenced him to life imprisonment (720 ILCS 5/33B-1(e) (West 2000)).  Defendant appeals, arguing the trial court erred in (1) denying his motion for a mistrial, (2) denying his motion for a directed verdict, (3) denying his motion for an acquittal or, in the alternative, for a new trial, and (4) adjudging him a "habitual criminal."  We affirm the trial court's judgment.      

I. BACKGROUND

Witnesses testified that on March 6, 1999, at approximately 10 p.m., a person in a ski mask and hooded coat entered a Taco Bell restaurant in Urbana, Illinois, produced a sawed-off shotgun, and demanded the money in the cash registers.  The State called six eyewitnesses to the robbery.  Most of them could tell that the robber was male, either from his build or his voice or both.  Estimates of his height ranged from 5 feet 9 inches to 6 feet 4 inches.  Because the eyeholes of the mask revealed the skin around the eyes, several of the witnesses saw he was black.

Witnesses testified the robber's coat was either black or dark blue.  It came down below his waist but not below his knees.  The hood was pulled up over his head.  One witness noticed the hood had a zipper.  Three witnesses saw masking tape across the back of the coat.

Several witnesses described the shotgun as well.  It was a black, single-barreled, sawed-off shotgun, with a pump-action and a pistol grip instead of a rear stock.    

The robber wore white Fila athletic shoes.  According to one witness, Lawrence Johnson, these were an older style of Fila shoe that one did not commonly see any more.  (He got a good look at the shoes when, at the robber's command, he lay down on the floor.)       

After employees handed him the money from the cash registers, the robber left the restaurant and fled on a bicycle.  Two customers, Priscilla Pruitt and Thad Rather, testified it was a mountain bike.  Pruitt testified it was light blue with white lettering.  Rather testified it was either a 10-speed or 12-speed bike.         

Cary Hansing was an assistant manager of the restaurant.  During cross-examination, defendant's attorney asked him:

"Q.  Do you see the man who committed the robbery in court today?

A.  Um, as far as his face, no.  But I do see his eyes.

Q.  Well, I'm asking you not about individual body parts.  I'm asking you, do you see the man who committed the robbery in court today?

A.  Yes."

Neither the defense counsel nor the prosecutor knew, beforehand, that Hansing would recognize defendant as the robber.  During redirect examination, Hansing identified defendant as the man to whom he was referring.  His eyes, he testified, were large and "not *** clear white.  They're kind of, just pale yellow."

Several of the eyewitnesses identified People's exhibit No. 1 as the robber's shotgun, People's exhibit No. 2 as his coat, and People's exhibit Nos. 3(a) and (b) as his shoes, or they testified that those exhibits looked like the robber's shotgun, coat, and shoes.  Pruitt identified People's exhibit No. 4 as the mountain bike.      

Leander Lee, 12 years old, testified that in March 1999 he was living in trailer No. 22 of Abe's Estates in Rantoul, Illinois.  In February of that year, he acquired a mountain bike, People's exhibit No. 4.  A month later, in March, the police took it from him.  To his knowledge, no one else ever took the bike.  He had kept it leaning against his front porch at night, never locking it up.  He had ridden the bike every day and never lent it to anyone, except, on rare occasions, to his cousins.  He neither knew nor recognized defendant. 

Steven Calhoun testified he first met defendant in approximately July or August 1998, when defendant brought an El Camino automobile to a body shop in Champaign, where Calhoun worked.  Eventually defendant and Calhoun became well-enough acquainted with one another to share heroin, to which Calhoun was addicted.  In the last part of February or the first part of March 1999, defendant called Calhoun to come and talk with him about an article in a newspaper.  That same day, Calhoun rode with defendant in the El Camino to Danville, Illinois.  Defendant was driving.  On the way, defendant stopped the car, pulled out a shotgun from behind the front seat, opened the hood, and hid it under the hood.  After getting back into the car and driving off again, he handed Calhoun a "stocking mask" and asked him to tear it to pieces and get rid of it.  Calhoun tore up the mask and threw the pieces out the car window.  Defendant acceded to Calhoun's suggestion that they take the shotgun to Calhoun's stepmother's house in Rantoul.  Calhoun hid it in the hall closet of her house.    

Calhoun testified that because he had taken possession of the sawed-off shotgun, the State had charged him with possessing an unlawful weapon.  He also faced a charge of domestic battery.  However, he denied having any expectation of leniency in his pending criminal cases as a result of his testimony.         Pamela Monroe testified she is defendant's wife.  In March 1999 she and defendant resided at trailer No. 25 in Abe's Estates in Rantoul.  On March 19, 1999, the police searched her trailer and, with her consent, her inoperable Toyota car, parked outside the trailer.  In the Toyota, the police found a blue coat she had bought for defendant from Goodwill Industries in November or December 1998.  She and defendant had two vehicles at that time:  the inoperable Toyota and the El Camino.  The El Camino's headlights would not work, and sometimes the car did not run.  In Monroe's opinion, the El Camino could have made the trip from Rantoul to Champaign during daylight hours on March 6, 1999, but it could not have done so at night because of the inoperable headlights.  Monroe further testified that on March 6, 1999, defendant was home in bed the whole night.  His back hurt, and he "had a real bad cold, problems breathing."

    Patrick Funkhauser, a Champaign police officer, testified he arrested defendant on March 19, 1999, and took defendant's shoes as evidence (People's exhibit Nos. 3(a) and (b)).  He admitted that Fila shoes were popular, and he was unaware of anything unique to differentiate defendant's shoes from any other Fila shoes of the same style and size.    

Dale Rawdin, a detective of the Champaign police department, identified People's exhibit No. 2 as the coat the police took out of the Toyota.  He had watched the officers remove the coat from the trunk, and it was in the same condition as when they seized it.  

Another Champaign detective, John Schweighart, testified he interviewed defendant on March 19, 1999, after the arrest.  Defendant admitted, during the interview, "that he does or that he was using heroin at the time."  The prosecutor then asked Schweighart:

"Q.  Did he tell you whether he had purchased some [heroin] that night?

A.  No.  When I asked about how much heroin he used or how much he paid for the heroin that was in his possession on the night of the arrest--

MS. LENIK [(defense counsel)]:  Objection.  Motion for a mistrial."

The trial court denied the motion for a mistrial, sustained the objection to testimony of other crimes, and instructed the jury to disregard Schweighart's answer to the last question.  

Schweighart further testified that he interviewed Steven Calhoun, promising him nothing.  Later, on March 22, 1999, he and Detective David Griffet went to the house of Edith Calhoun, Steven Calhoun's grandmother, in Rantoul.  They requested permission to search her house, whereupon she "left the kitchen *** and came back holding a sawed[-]off shotgun, with a pistol grip [(People's exhibit No. 1)], and asked if this was what [they] were looking for."  She had found the shotgun in a closet in the hallway.  

Griffet testified he saw the bicycle (People's exhibit No. 4) near the front porch of a neighboring residence as the police searched defendant's residence on March 19, 1999.  The neighboring residence was across the street and two trailers down from defendant's residence.   

Troy Phillips, an Urbana police officer, testified that when the police arrested defendant on March 19, 1999, defendant admitted using heroin.  He estimated defendant's height to be 6 feet 2 inches.    

The State rested, and defendant moved for a directed verdict, arguing that "the identification testimony has been nil."  The trial court denied the motion because it believed "there [was] sufficient evidence on each element, including [the] identity of the [d]efendant."

Counsel stipulated that a forensic scientist had found "no latent prints" from three shotgun shells and the sawed-off shotgun.  The trial court informed the jury of the stipulation.

Jeff Atteberry was defendant's first witness.  He testified he was the area supervisor for Wackenhut Corporation.  People's exhibit No. 2 looked like the parkas Wackenhut issued to its security officers.  Atteberry could see, beneath the masking tape, part of the lettering spelling "Wackenhut."  In the vicinity of Rantoul, Wackenhut had 24 security officers, each of whom would have had a similar coat.    

Edith Calhoun testified that the police came to her house and told her they knew Steven Calhoun had left a gun there and they wanted to search for it.  She found the shotgun in a closet and gave it to them.  

Defendant's mother-in-law, sister-in-law, and aunt, as well as his wife's first cousin, testified that defendant was sick in bed all day and night on March 6, 1999.  They either stopped by defendant's house that evening and saw him in bed with flu-like symptoms and a bad back, or they stayed in his house, watched his children, and prepared soup for him.       

Robert Miller testified he worked at Leon and Tommy's Body Shop in Champaign.  "[P]robably around about February of '99"--he actually could not "remember *** which month"--he attempted, unsuccessfully, to repair an electrical defect in defendant's El Camino, which defendant had brought to the shop from Rantoul.  The headlights would not work.  Steven Calhoun sometimes spent the night sleeping in the shop, and the keys to the vehicles would have been accessible to him.  

Timothy Smith testified he was a mechanic and also the landlord at Abe's Estates, a mobile-home park in Rantoul.  He worked on the electrical system of defendant's El Camino and put a new transmission in it.  To make those repairs, he had possession of the El Camino periodically in February and March 1999, sometimes two or three days at a time.  He was uncertain, however, whether those two or three days fell in February or in March.  Smith had agreed to rebuild the motor in defendant's van in return for defendant's transferring ownership of the El Camino to him.  Defendant transferred the title to Smith right before the police arrested defendant.  Smith did not think the El Camino was in good enough condition on March 6, 1999, to travel from Rantoul to Champaign.  The car tended to overheat and die.

Defendant rested, and on February 10, 2000, the jury found him guilty of armed robbery.  

On March 2, 2000, the trial court granted defendant's motion for substitution of counsel.  The trial court vacated the appointment of defendant's trial counsel, Diana Lenik, and appointed David Rumley of the public defender's office to represent defendant in posttrial proceedings.  

On May 2, 2000, Rumley filed a motion for an acquittal or, in the alternative, for a new trial.  The motion alleged, 
inter
 
alia
, that Lenik's assistance was ineffective in that she had "failed to subpoena key defense witnesses," including Steve Campbell and McClenda Pollard.  On May 5, 2000, in the hearing on the motion, defendant testified that Pollard would have corroborated that he had a lawn-care business, because she was one of his customers.  Defendant saw, in a police report, that a person named Steve Campbell was a customer in the restaurant during the robbery.  Defendant testified he had a cousin by that name and had ascertained from his aunt that this cousin was indeed in the restaurant during the robbery.  According to defendant, Campbell might have testified that the robber's voice did not sound like defendant's voice.  Defendant did not know if Lenik had interviewed Campbell and Pollard.  During the hearing on the posttrial motion, Rumley called Lenik to testify but did not ask her if she had interviewed Campbell and Pollard.  Nor did he present any affidavits by those two witnesses.  The trial court denied the posttrial motion.    

On May 30, 2000, the trial court adjudged defendant a "habitual criminal" because of the following criminal history.  Defendant pleaded guilty to armed robbery in case No. 74-X-104 in Champaign county circuit court.  On May 6, 1974, the court entered judgment on his guilty plea and sentenced him to imprisonment for 6 to 12 years.  On October 14, 1977, defendant was released on parole.  He was discharged from parole on February 27, 1980.  On October 7, 1987, in case No. 87-CF-526, the Champaign County circuit court sentenced him to imprisonment for armed robbery.  He was imprisoned on October 21, 1987, and was released on April 4, 1997.

II. ANALYSIS

A. Motions for a Directed Verdict and for Acquittal

Defendant contends the trial court should have granted his motions for a directed verdict and for acquittal notwithstanding the verdict because no rational jury would have believed that Hansing could identify him as the robber by his memory of a fleeting glimpse at the robber's eyes.    

As the State says, we look at 
all
 of the evidence (not just Hansing's in-court identification) in a light most favorable to the State (see 
People v. Turner
, 127 Ill. App. 3d 784, 790, 469 N.E.2d 368, 372 (1984)), asking "'whether a reasonable mind could fairly conclude the guilt of the accused'" (
People v. Hendricks
, 137 Ill. 2d 31, 63, 560 N.E.2d 611, 625 (1990), quoting 
People v. Withers
, 87 Ill. 2d 224, 230, 429 N.E.2d 853, 856 (1981)).  Because a motion for an acquittal notwithstanding the verdict seeks essentially the same relief as a motion for a directed verdict (
People v. Rey
, 136 Ill. App. 3d 645, 650, 483 N.E.2d 982, 986 (1985)), the same standard of review applies to both motions (
People v. Carter
, 306 Ill. App. 3d 867, 872, 715 N.E.2d 1196, 1199 (1999), 
rev'd on other grounds
, 194 Ill. 2d 88, 741 N.E.2d 255 (2000)).  
  

Defendant's conviction does not rest entirely upon Hansing's in-court identification.  
The narrow segment of face visible through the eyeholes of the mask was only part of the evidence, only one piece of the puzzle.  It revealed, at a minimum, that the robber was black.  The voice was male.  That was another piece.  Hansing's testimony about the eyes and his in-court identification could have weighed little or nothing in the jury's deliberations.    

There was other evidence, including the coat.  A hooded, dark blue coat, without more, would be a "frequently used mode of masculine dress," like the white T-shirt, khaki pants, and white athletic shoes in 
People v. Moore
, 6 Ill. App. 3d 932, 936 n.2, 287 N.E.2d 130, 134 n.2 (1972); but this coat was distinctive in that there was masking tape across the back of it.  "Courts will take judicial notice of the variety, conventionality[,] and utility in modes of dress."  
Moore
, 6 Ill. App. 3d at 936 n.2, 287 N.E.2d at 134 n.2.  We take judicial notice that few people cover the upper back of their coat with masking tape.    

Defendant argues that Steven Calhoun--or whoever "the real robber" was--could have "planted" the coat in Monroe's Toyota.  Monroe testified, however, that she had bought the coat for defendant.  Significantly, she did not testify that the coat had masking tape on it when she bought it.  It is unclear how someone could have "planted" the coat in the trunk.    

The robber's white athletic shoes would be comparable to those in 
Moore
, 6 Ill. App. 3d at 936 n.2, 287 N.E.2d at 134 n.2, if Johnson had not testified that "[t]hey're rare, because they [are] old."   

Another piece of the puzzle was the shotgun.  Witnesses described it with particularity, and evidently People's exhibit No. 1 conformed to that description.  In addition to its being sawed off, People's exhibit No. 1 was distinctive in that it had a pistol grip instead of a shoulder-stock.  

Finally, defendant had access to a blue mountain bike with white lettering, which Leander Lee had left unlocked on his front porch, across the street and two doors down from defendant's residence.  

Defendant alleges several discrepancies in the State's evidence.  For example, 
an assistant manager of the restaurant, Helen Mullins, testified the robber's coat had buttons, but she corrected herself when she saw People's exhibit No. 2, which had a zipper and snaps.  Estimates of the robber's height varied by as much as seven inches.  "[D]iscrepancies and omissions of detail affect only the witness'[s] credibility and the weight to be given his testimony by the trier of fact."  
People v. Winston
, 160 Ill. App. 3d 623, 628, 513 N.E.2d 1121, 1124 (1987).  "Courts typically have not considered discrepancies as to height *** alone as [a] decisive factor[] on review because few persons are capable of making accurate estimations of such [a] characteristic."  
People v. Slim
, 127 Ill. 2d 302, 312, 537 N.E.2d 317, 321 (1989).  

After attacking discrepancies in the details of the eyewitnesses' testimony, defendant argues he had an unrebutted alibi.  Several witnesses testified he was sick in bed on March 6, 1999.  "[T]he jury had no obligation to believe defendant's alibi evidence ***."  
People v. Tennant
, 65 Ill. 2d 401, 412, 358 N.E.2d 1116, 1121 (1976).  These alibi witnesses were defendant's wife, his relatives, or relatives of his wife.  The jury could have found they were biased in defendant's favor.   

Defendant attempted to convince the jury he could not possibly have committed the robbery because he had no transportation from Rantoul to Urbana.  As Miller testified, the El Camino's mechanical problems did not prevent defendant from driving it from his home in Rantoul to the shop in Champaign.  Steven Calhoun testified that he and defendant journeyed to Danville in the El Camino during the last part of February or the first part of March 1999.  The jury could have found that the car, though unreliable, had the capacity to travel from Rantoul to Urbana.   

Considering 
all
 of the evidence in a light most favorable to the State, we hold that a rational trier of fact could have found, beyond a reasonable doubt, that defendant was the robber.  See 
Hendricks
, 137 Ill. 2d at 63, 560 N.E.2d at 625.

B. Motion for a New Trial

1. 
Hansing's In-Court Identification of Defendant

We will apply the following standard of review to the trial court's denial of defendant's motion for a new trial:

"'The decision of a trial court to grant a new trial is an exercise of discretion which should not be disturbed unless a clear abuse of that discretion is shown.  [Citations.]  In determining whether that discretion was abused, the reviewing court will consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial.'"  
People v. Dixon
, 256 Ill. App. 3d 771, 778, 628 N.E.2d 399, 404-05 (1993), quoting 
Reidelberger v. Highland Body Shop, Inc.
, 83 Ill. 2d 545, 548-49, 416 N.E.2d 268, 270 (1981). 

We have found the evidence was sufficient to convict defendant.  Defendant contends he was denied a fair trial because (1) the jury "improperly considered" Hansing's "volunteered in-court identification," and (2) Schweighart improperly testified that defendant possessed heroin when the police arrested him. Hansing did not "volunteer" the in-court identification of defendant.  Defense counsel asked Hansing if he saw the robber in the courtroom, and Hansing said yes--an answer responsive to the question.  "A defendant who procures *** [or] invites *** the admission of evidence, even though it be improper, cannot be heard to complain about it on appeal."  
People v. Jones
, 119 Ill. App. 3d 615, 628, 456 N.E.2d 926, 936-37 (1983).

2. 
Other Crimes
     

"
[T]he error of admitting evidence of other crimes for which defendant is not on trial can be cured when the improper testimony is promptly stricken and the trial court instructs the jury to disregard it."  
People v. Biggs
, 294 Ill. App. 3d 1046, 1051, 691 N.E.2d 48, 52 (1998).  The trial court sustained defendant's objection to Schweighart's testimony that defendant possessed heroin.  Then the trial court promptly instructed the jury:  "I have ordered stricken from the record the last answer given by the witness before you left the courtroom.  You are instructed to disregard that answer."  Moreover, 
other witnesses, besides Schweighart, testified to defendant's use of heroin, and defendant did not object to their testimony.  "A defendant waives any issue as to the impropriety of evidence if he *** acquiesces in the admission of evidence."  
People v. Pollard
, 225 Ill. App. 3d 970, 975, 589 N.E.2d 175, 178 (1992).  Defendant suffered no prejudice from Schweighart's testimony because defendant acquiesced in the admission of additional evidence that he was a user (and, therefore, a possessor) of heroin.  
We find no abuse of discretion in the trial court's denial of defendant's motion for a mistrial.

C. Alleged Ineffective Assistance of Posttrial Counsel

The posttrial motion was a critical part of the criminal proceeding, and defendant had a right, under the sixth amendment, to the assistance of counsel in preparing and arguing the motion.  
People v. Finley
, 63 Ill. App. 3d 95, 103, 379 N.E.2d 645, 650 (1978), citing 
Mempa v. Rhay
, 389 U.S. 128, 19 L. Ed. 2d 336, 88 S. Ct. 254 (1967).  The constitutional right to the assistance of counsel implies the right to the 
effective
 assistance of counsel.  
Strickland v. Washington
, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692, 104 S. Ct. 2052, 2063 (1984).

In his reply brief, defendant says that "[t]he issue is a narrow one":  whether posttrial counsel was so ineffective that we should presume prejudice under 
United States v. Cronic
, 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047 (1984).  "The record," defendant says, "is not adequate to support a related [s]ixth[-][a]mendment claim 
*** that­ [postconviction] counsel (or trial counsel) was ineffective under the 
Strickland
 test."  See 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.  Therefore, we will limit our consideration to whether we should presume prejudice under 
Cronic
.

The Supreme Court held in 
Cronic
, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047:  "[I]f counsel 
entirely
 fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of [s]ixth[-][a]mendment rights that makes the adversary process itself presumptively unreliable."  
(Emphasis added.)  We will not presume prejudice unless the attorney completely failed, "throughout" the proceeding "as a whole," to oppose the prosecution's case.  See 
Bell v. Cone
, 535 U.S. ___, ___, 152 L. Ed. 2d 914, 928, 122 S. Ct. 1843, 1851 (2002).  It is not enough that the attorney 
"failed to do so at specific points."  
Bell
, 535 U.S. at ___, 152 L. Ed. 2d at 928, 122 S. Ct. at 1851.     

Defendant contends that by neglecting to (1) present affidavits by Campbell and Pollard to show what their testimony would have been and (2) ask Lenik whether she had interviewed either or both of those witnesses, Rumley totally failed to subject the prosecution's case to any meaningful adversarial testing whatsoever.  This is an exaggeration.  

Rumley called three witnesses at the hearing on the posttrial motion:  Griffet, Lenik, and defendant himself.  He asked Lenik such questions as why she did not file a motion to suppress evidence
, how many times she met with defendant or talked with him on the telephone, whether she had discussed a negotiated plea with defendant, and whether she had interviewed certain police officers.  In his questioning of defendant, Rumley elicited testimony that Lenik ignored defendant's suggestions when preparing for trial and did not spend much time with him.  At the conclusion of the testimony, Rumley made a closing argument.  Clearly, he subjected the prosecution's case to 
some
 meaningful adversarial testing, even if, as defendant argues, he could and should have done additional things.  A defense counsel's failure to interview certain witnesses or call them to testify generally requires an analysis under 
Strickland
.  See, 
e.g.
, 
People v. Guest
, 166 Ill. 2d 381, 400, 655 N.E.2d 873, 882 (1995); 
People v. Flores
, 128 Ill. 2d 66, 85-86, 538 N.E.2d 481, 488 (1989).     

D. Habitual Criminal Act

1. 
"
Time
 
in
 
Custody
"

Section 33B-1(a) of the Habitual Criminal Act (720 ILCS 5/33B-1(a) (West 2000)) provides:

"Every person who has been twice convicted *** of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony ***, and is thereafter convicted of a Class X felony *** committed after the 2 prior convictions, shall be adjudged an habitual criminal."

"Except when the death penalty is imposed, anyone adjudged an habitual criminal shall be sentenced to life imprisonment."  720 ILCS 5/33B-1(e) (West 2000).  

Section 33B-1(d) provides:

"This [a]rticle shall not apply unless each of the following requirements are [
sic
] satisfied:

(1) the third offense was committed after the effective date of this Act;

(2) the third offense was committed within 20 years of the date that judgment was entered on the first conviction, 
provided, however, that time spent in custody shall not be counted
;

(3) the third offense was committed after conviction on the second offense;

(4) the second offense was committed after conviction on the first offense."  (Emphasis added.)  720 ILCS 5/33B-1(d) (West 2000).

The parties agree that armed robbery had the same elements in 1974 and 1987 as it had in 1999.  The parties also agree that sections 33B-1(d)(1), (d)(3), and (d)(4) of the Habitual Criminal Act are fulfilled.  

Defendant disagrees that subsection (d)(2) is fulfilled.  He committed the third offense on March 6, 1999--precisely 24 years and 10 months after May 6, 1974, when the Champaign County circuit court entered judgment for the first offense.  Defendant argues that the trial court misapplied the Habitual Criminal Act by reducing that 24 years and 10 months by (1) the time defendant was in custody for the second offense and (2) the time he was on parole.  According to defendant, only the time he actually spent in prison for the first offense should be deducted from the 24 years and 10 months.  Because he was imprisoned only 3 years and 5 months for the first offense, the span of time between the entry of judgment for the first offense and his commission of the third offense is, he argues, more than 20 years.   

The State argues that "time spent in custody" means any time in custody, including imprisonment for the second as well as the first offense.  The State further argues that parole counts as time in custody.  Clearly, under the State's interpretation of subsection (d)(2), the exclusions of time would be substantial enough that the date of the third offense would be less than 20 years after the date of judgment for the first offense, making defendant a "habitual criminal."

Defendant reasons that because subsection (d)(2) refers only to the first and third convictions, its proviso, "time spent in custody shall not be counted," refers only to time spent in custody for the first conviction.  If the legislature intended to "tack" the time in custody for the second offense onto the time in custody for the first, "it could have said so without difficulty," defendant argues.  "All it would have needed to say in [section 33B-1](d)(2) was, 
e.g.
, '[t]ime spent in custody on the first offense or any subsequent offense ***.'"  The legislature said the same thing, however, in a more concise way:  "time spent in custody shall not be counted."  If the legislature intended subsection (d)(2) to be interpreted the way defendant interprets it, the legislature could have easily said:  "Time in custody 
for the first offense
 shall not be counted."  Defendant reads into the statute a limitation that is not in the text of the statute.  "When the language of a statute is plain and unambiguous, courts may not read in exceptions, limitations, or other conditions."  
In re D.D.
, 196 Ill. 2d 405, 419, 752 N.E.2d 1112, 1120 (2001).

According to defendant, in 
People v. Dunigan
, 165 Ill. 2d 235, 650 N.E.2d 1026 (1995), the supreme court "strongly implies, if it does not hold, that the prescribed period under [section] 33B-1(d)(2) is a calendar [20]-year period and not an artificial period created by 'tacking' custody time for the second conviction."  We disagree.  In 
Dunigan
, 165 Ill. 2d at 240, 650 N.E.2d at 1028, the defendant committed the third offense within 20 years after his conviction for the first offense.  Therefore, any time he spent in custody was irrelevant.

2. 
Relationship to Extended-Term Sentencing Statutes
    

Defendant argues that by sentencing him to life imprisonment under the Habitual Criminal Act, the trial court ignored the extended-term sentencing provision in section 5-8-2(a) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-8-2(a) (West 2000)), which incorporates section 5-5-3.2 of the Unified Code (730 ILCS 5/5-5-3.2 (West 2000)).  Because defendant was convicted of the third armed robbery within 10 years after he was convicted of the second armed robbery, he argues that he was eligible for (the less severe) extended-term sentencing rather than life imprisonment under the Habitual Criminal Act.  See 730 ILCS 5/5-5-3.2(b)(1) (West 2000).  We disagree.    

Imposition of an extended term is permissive.  730 ILCS 5/5-8-2(a) (West 2000) ("the judge 
may
 sentence an offender to the following" (emphasis added)); 730 ILCS 5/5-5-3.2(b) (West 2000) ("The following factors 
may
 be considered by the court ***" (emphasis added)); 
People v. Nolan
, 291 Ill. App. 3d 879, 887, 684 N.E.2d 832, 837 (1997).  Section 33B-1(a) of the Habitual Criminal Act provides:  "Every person [whose felony convictions meet the requirements of the statute] 
shall
 be adjudged an habitual criminal."  (Emphasis added.)  720 ILCS 5/33B-1(a) (West 2000).  Section 33B-1(e) provides:  "Except when the death penalty is imposed, anyone adjudged an habitual criminal 
shall
 be sentenced to life imprisonment."  (Emphasis added.)  720 ILCS 5/33B-1(e) (West 2000).  Thus, statutory law did not require the trial court to impose an extended term, but it did require the trial court to adjudge defendant a habitual criminal and sentence him to life imprisonment if he met the requirements of the Habitual Criminal Act.  

3. 
Parole

Defendant cites 
People v. Robinson
, 89 Ill. 2d 469, 433 N.E.2d 674 (1982), as authority for his argument that periods of parole are not "time spent in custody."  In that case, the supreme court considered whether time spent in federal custody should be excluded from the 10-year period in section 5-5-3.2(b)(2) of the Unified Code (Ill. Rev. Stat. 1979, ch. 38, par. 1005-5-3.2(b)(1)).  

Whether parole was "time spent in custody" was not an issue in 
Robinson
.  Comments by a reviewing court on a point not in controversy "lack[] the authoritative force of a precedent."  
Sexton v. Brach
, 124 Ill. App. 3d 202, 206, 464 N.E.2d 284, 287 (1984).  Besides, the supreme court
 did not comment, in 
Robinson
, that "time spent in custody" excludes periods of parole.  Defendant argues that the supreme court so implied.  He reasons as follows.  If periods of parole were time in custody, the supreme court did not have to decide whether time in federal custody counted in the computation of the 10 years.  Before his federal conviction, the defendant in 
Robinson
 was on parole for a conviction in state court.  
Robinson
, 89 Ill. 2d at 471, 433 N.E.2d at 675.  Subtracting that period of parole would have reduced the time between his 1967 conviction and 1979 conviction to less than 10 years, making the intervening time in federal custody superfluous.  Therefore, the implication is that periods of parole are not "time spent in custody."    

The implication is unreliable.  Counting the parole might well have been an alternative way to affirm the appellate court's judgment in 
Robinson
.  Nevertheless, the issue before the supreme court was whether time in federal custody should have been excluded when counting the 10 years.  
Robinson
, 89 Ill. 2d at 473, 433 N.E.2d at 676.  The supreme court could have chosen to address that issue head-on rather than sidestep it and resolve the case on an issue the parties apparently never briefed.

Citing decisions of the United States Supreme Court, defendant argues that "custody means actual custody in the law of American criminal procedure."  We find a more specifically relevant authority in Illinois statutory law.  Section 3-14-2(a) of the Unified Code (730 ILCS 5/3-14-2(a) (West 2000)) says:  "The Department shall retain custody of all persons placed on parole ***."  Thus, persons on parole are still within custody, and periods of parole are "time spent in custody" for purposes of the Habitual Criminal Act.  
Cf
.
 
People v. Smith
, 199 Ill. App. 3d 839, 857-58, 557 N.E.2d 596, 609-10 (1990) (which held that "time in custody," in the extended-term sentencing statute (Ill. Rev. Stat. 1985, ch. 38, par. 1005-5-3.2(b)(1) (now 730 ILCS 5/5-5-3.2(b)(1) (West 2000))), includes time on parole).

As the State points out, interpreting "time spent in custody" to exclude periods of parole would make a portion of the Habitual Criminal Act (720 ILCS 5/33B-2(b) (West 2000)) superfluous.  Section 33B-2(b) provides:

"A duly authenticated copy of the record of any alleged former conviction of an offense set forth in [s]ection 33B-1 shall be prima facie evidence of such former conviction; and 
a duly authenticated copy of the record of the defendant's final release or discharge from probation granted, or from sentence and parole supervision (if any) imposed pursuant to such former conviction, shall be prima facie evidence of such release or discharge
."  (Emphasis added.)  720 ILCS 5/33B-2(b) (West 2000).

If periods of parole did not count as "time spent in custody," the date of the "final release or discharge from *** parole supervision" (720 ILCS 5/33B-2(b) (West 2000)) would be irrelevant.  Defendant argues:  "[T]he purpose of proving the term of parole is to establish the date of actual release from actual custody (prison) ***."  If imprisonment alone suspended the running of the 20-year clock, one would have to prove not the term of parole but only the beginning date of parole.      

4. 
Apprendi

Citing 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), defendant contends that the sentence of life imprisonment under the Habitual Criminal Act violated his constitutional rights to due process and a trial by jury.  We adhere to our recent decision in 
People v. Allen
, 335 Ill. App. 3d 773, 785, 780 N.E.2d 1133, 1143 (2002), that "
Apprendi
 does not render section 33B-1 *** unconstitutional."

   
 III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH, P.J., and TURNER, J., concur.