THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAURICE DURGAN, Defendant-Appellant.

Fourth District No. 4—02—0907

Argued March 9, 2004.—Opinion filed March 30, 2004.—Rehearing denied April 27, 2004.

Michael J. Pelletier and Shawn O'Toole (argued), both of State Appellate Defender's Office, of Chicago, for appellant.

Frank Young, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In August 2002, a jury convicted defendant, Maurice Durgan, of (1) one count of possession of a substance containing cocaine (720 ILCS 570/402(c) (West 2000)) and (2) one count of possession of more than 1 gram but not more than 15 grams of a substance containing cocaine with intent to deliver (720 ILCS 570/401(c)(2) (West 2000)). In October 2002, the trial court sentenced him to eight years in prison on the possession-with-intent-to-deliver conviction. (The court did not enter judgment on the other conviction, having determined that it merged into defendant's conviction for possession with intent to deliver.)

Defendant appeals, arguing that (1) the stipulated testimony of a forensic chemist was inadequate to establish that (a) an adequate foundation existed for the chemist's testimony and (b) the chemist tested all of the individually wrapped packets of cocaine found in defendant's possession; (2) the State did not establish a proper chain of custody for the seized cocaine; (3) the trial court erred by (a) replacing a sick juror with an alternate juror after the jury began deliberating and (b) relying on evidence outside the record in denying his post-trial motion; (4) the State failed to prove him guilty beyond a reasonable doubt; and (5) he received ineffective assistance of trial counsel. We disagree and affirm.

## I. BACKGROUND

In February 2001, the State charged defendant with (1) one count of possession of a substance containing cocaine (720 ILCS 570/402(c) (West 2000)) and (2) one count of possession of more than 1 gram but not more than 15 grams of a substance containing cocaine with intent to deliver (720 ILCS 570/401(c)(2) (West 2000)).

Following an October 2001 trial, a jury convicted defendant of both charges. In November 2001, defendant filed a motion for a new trial. At a January 2002 hearing on that motion, defense counsel argued facts from a different case. The trial court then *sua sponte* found that defense counsel provided ineffective assistance and granted defendant's motion for a new trial.

At the start of defendant's August 2002 retrial, the bailiff informed the trial court that one of the jurors (referred to in the record only as Mr. Gilpin) had been sick the previous night. The bailiff instructed Gilpin to let the court know if he felt sick, and the court proceeded with defendant's trial.

Danville police officer Troy Wasson testified that he had (1) been an officer since 1996, (2) attended five training seminars on drug enforcement, and (3) been involved in at least 50 drug cases. Around 3

p.m. on December 15, 2000, he went to an apartment located at 915 Redden Court in Danville to execute a search warrant. While Wasson and other officers waited outside the apartment for the "target person" (an individual other than defendant) to arrive, Wasson saw defendant standing either just outside or in the front doorway. When the officers approached the apartment to begin the search, defendant yelled "police" and went inside the apartment. Officers arrested defendant and six other individuals as they left the apartment through its back door and later took them to the Danville public safety building. Officers searched the apartment and found cannabis and cocaine.

When Wasson arrived at the public safety building, Danville police officer John Thompson handed him a clear plastic bag that contained individual packages (plastic Baggie corners that were tied off) containing a substance that the officers suspected was crack cocaine. (Thompson found the plastic bag in a trash can near where defendant had been sitting in the "book-in" area prior to being searched.) Although Wasson initially testified that the plastic bag contained 19 individually wrapped packages, he later testified that it contained either 18 or 19 individually wrapped packages. Wasson secured the plastic bag containing the individually wrapped packages and later handed it to Danville police officer Ron Soderstrom, who processed it as evidence. Wasson denied tampering with the plastic bag.

Wasson opined that the individually wrapped packages were intended for sale. He explained that based on his training and experience, "a normal user or addict of crack cocaine wouldn't carry that amount of crack cocaine on them." Wasson stated that he would not change his opinion if the larger plastic Baggie contained 18 individually wrapped Baggies, not 19.

Thompson testified that after officers transported defendant to the public safety building, Thompson sat him on the floor beside a bench, where three other individuals were handcuffed. Thompson and a correctional officer then escorted the individuals, including defendant, one by one to another room and searched them. Thompson then searched the book-in area. At the top of the trash in a trash can that was located about $3\frac{1}{2}$ feet from where defendant had been sitting, Thompson found a clear plastic bag that contained several individually wrapped packages of an "off-white[,] rock-like substance." Thompson took the bag as evidence and gave it to Wasson. He had the bag for only a couple of minutes, just long enough to walk up one flight of stairs and hand it to Wasson. Thompson denied counting the individual packages or tampering with the plastic bag.

Soderstrom testified (through the trial court's admission of a transcript of his testimony at defendant's first trial) that when items

are recovered, officers immediately label them with the time, location, and the name of the officer who recovered them. On the day Wasson gave him the plastic bag, Soderstrom weighed it, filled out an inventory tag describing the bag and its contents, and placed the plastic bag in a paper bag. He then labeled the paper bag with the December 15, 2000, recovery date, the police report number, his and Wasson's badge numbers, sealed it, initialed the label, and placed the paper bag in an evidence locker. Soderstrom placed the key to that evidence locker, along with a yellow duplicate inventory tag, in another locker, to which only the evidence officer had access. He identified People's exhibit No. 1 as the paper bag that contained the clear plastic bag containing individually wrapped packages. Soderstrom explained that he recognized his handwriting on the property tag and recalled filling out that tag for that specific piece of evidence on December 15, 2000.

Danville police officer Larry Thomason, the evidence officer, testified that when an officer recovers an item, he places it in an appropriate-sized container and seals the container. The officer places various identifying markings on the container and attaches a property tag (1) indicating the police report number, the name of the officer, and the offense and (2) describing the contents of the container. The officer then places the container in an evidence locker and puts the locker key in another locker, to which only Thomason and his assistant have access.

Thomason identified People's exhibit No. 1 as the paper bag that contained the clear plastic bag containing individually wrapped packages. He also identified a white form with a red sticker on it that was attached to exhibit No. 1 as the inventory tag. A yellow duplicate of that inventory tag was attached to the locker key for the locker in which People's exhibit No. 1 had been stored. On December 19, 2000, Thomason retrieved the paper bag (People's exhibit No. 1) from the evidence locker, took it to the evidence room, and placed it in a storage bin. When he retrieved the paper bag, it was sealed, and the white inventory tag was attached to it with staples. Thomason entered the information from the inventory tag into a computer program that tracked the evidence's whereabouts. On December 27, 2000, he wrote the date and his initials on the paper bag and sent it to the Illinois State Police crime laboratory by certified mail. When Thomason placed it in the mail, the paper bag was still sealed. On February 1, 2001, he picked up the bag from the crime laboratory and returned it to the original storage area in the public safety building. When Thomason picked up the bag, it was sealed with blue tape from the laboratory. Thomason denied opening the paper bag or tampering with it.

The testimony of Kristin Stiefvater, an Illinois State Police forensic

chemist, was presented via a stipulation that the parties agreed upon and the trial court accepted. That stipulation, which the prosecutor read to the jury, provided as follows:

"[Stiefvater] would testify that she is a trained, experienced forensic scientist in the Springfield [c]rime [l]aboratory.

That on December 28th, 2000, she received People's [e]xhibit [No.] 1 in a sealed condition.

That she tested the contents of People's [exhibit No.] 1.

That she determined People's [exhibit No.] 1 to contain 18 plastic [B]aggies.

Contents of the plastic [B]aggies contained 1.8 grams of off-white chunk substance, being the net weight of chunky substance, cocaine being present as the base[,] in her opinion, based upon her training and testing and experience.

That after testing People's [e]xhibit [No.] 1 and its contents[,] she resealed it and returned it to [Thomason] in a sealed condition."

Danville police officer Mike Cox testified that on the evening of December 15, 2000, he interviewed defendant at the public safety building. After waiving his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), defendant told Cox that earlier that day, he had been at 915 Redden Court to "chill[ ]out" and do "a little gambling." Defendant admitted that when officers arrested him and took him to the book-in area, he had a "real skinny, rolled up blunt" in his jacket pocket and a "few bags" of crack cocaine hidden in his underwear. While sitting in the book-in area, he threw the cocaine in a nearby trash can. He told Cox that he used cocaine "every blue moon" and the cocaine he threw in the trash can was for his personal use. Specifically, defendant used the cocaine to make a "premo blunt." Cox explained that (1) a "blunt" is made by cutting a cigar lengthwise, removing the inner tobacco and replacing it with cannabis, and then rolling the outer tobacco leaves back together so that it looks like a thinner cigar; and (2) a "premo" blunt is one that has been laced with cocaine.

On this evidence, the State rested, and defendant presented no witnesses. After the trial court instructed the jury, it asked Gilpin if he was well enough to participate in deliberations. Gilpin responded that he felt well enough, and at 11:45 a.m., the court instructed the jury to leave the courtroom and begin deliberations. The court also asked the alternate juror (referred to in the record only as Ms. Lewis) to stay in the courtroom. The following discussion then took place outside the jury's presence:

"THE COURT: Okay. Ms. Lewis, normally I would discharge you completely from further service since we have the other 12 that are

going back to begin deliberations. What I'd like to do, however, in your particular case[,] is I'm going to release you, but I'm going to ask that you still not talk with anyone about the case. Leave your notebook here. There is the remote possibility that we would then reenlist your services if[,] for some reason[,] Mr. Gilpin cannot make it through deliberations.

All right. So although you'll be released to leave and, in fact, if—what we could do is since we're going to be probably ordering lunch if you want to wait here we'll get lunch for you as well. And you're welcome to have that lunch. You can't eat with the rest of the jurors or anything like that, but we can put you somewhere else.

MS. LEWIS: Okay.

THE COURT: We'll just ask that you not talk with anyone about the case or discuss the case in any way until we know whether they are able to reach a verdict and whether Mr. Gilpin is going to be able to complete his service, because if he's not[,] then there is that possibility that you would have to go in and begin [*sic*] part of deliberations.

Any other instructions that counsel wishes for Ms. Lewis?

[PROSECUTOR]: Just that she leave with the clerk some way of contacting her if we need her.

THE COURT: We need a telephone number, cell phone number, something.

MS. LEWIS: I don't have a telephone. I live in Georgetown, so I'll stay here.

THE COURT: If you'll leave your telephone number[,] then when the clerk—

MS. LEWIS: I can just go home you mean?

THE COURT: Sure.

MS. LEWIS: Okay. Okay.

THE COURT: You're welcome to wait here till lunch is delivered and have lunch, if you wish, or you're welcome to take it with you and then go home, but it's just a little unusual. Mr. Gilpin said he's indicated he was sick all last evening. And if there is the possibility that he's not going to be able to complete service then we would need you. So I'm not going to discharge you completely from any possible service.

Okay. Anything else for Ms. Lewis?

[PROSECUTOR]: No, your Honor.

[DEFENSE COUNSEL]: No, your Honor.

THE COURT: Okay."

Lewis then left the courtroom.

At 12:30 p.m., 45 minutes after the jury left the courtroom to begin deliberations, the trial court was informed that Gilpin was too ill to continue serving as a juror. The following discussion then took place outside the jury's presence:

"[THE COURT]: We've retained [Lewis]. She is still available. She's been isolated and separated from the other jurors, but is immediately available to take Mr. Gilpin's place.

After discussions *** with the attorneys, [prosecutor], do you have any objection to replacing Mr. Gilpin with the alternate, Ms. Lewis?

[PROSECUTOR]: No, your Honor.

THE COURT: And [defense counsel], any objection?

[DEFENSE COUNSEL]: No, I don't, your Honor."

The court then excused Gilpin as a juror and replaced him with Lewis.

After deliberating between 4 and 4½ hours, the jury convicted defendant of both charges, and the trial court entered judgment only on the conviction for possession of more than 1 gram but not more than 15 grams of a substance containing cocaine with intent to deliver (720 ILCS 570/401(c)(2) (West 2000)). The court later sentenced defendant as stated.

This appeal followed.

## II. ANALYSIS

### A. The Adequacy of the Forensic Chemist's Stipulated Testimony

#### 1. *Foundation for Stiefvater's Expert Opinion*

Defendant first argues that the State failed to provide an adequate foundation for Stiefvater's expert opinion that the substance found in defendant's possession contained cocaine. Specifically, he contends that Stiefvater's stipulated testimony did not show (1) what tests Stiefvater performed on the substance; (2) whether those tests were "commonly used in the area of forensic chemistry"; (3) how Stiefvater recorded her findings; and (4) whether the equipment she used in testing the substance was functioning properly. Defendant further claims that because his argument attacks the sufficiency of the evidence, his argument is not subject to forfeiture. We disagree.

■ Initially, we reject defendant's attempt to couch his foundational argument as a challenge to the sufficiency of the evidence. In *People v. DeLuna*, 334 Ill. App. 3d 1, 20, 777 N.E.2d 581, 598 (2002), the First District held that an attack as to the proper foundation for expert testimony bears on the admissibility of the evidence rather than the sufficiency of the evidence to convict. The First District explained as follows:

"Arguably, sufficiency involves absence of proof of a basic element of the crime. Defendant here is not challenging the lack of proof as to the existence of an element of the crime, since [the expert] testified to the identity of the controlled substance. The challenge is to the failure to lay a proper foundation for the proof of that element.

This goes to a determination of its admissibility, rather than sufficiency of the evidence presented." *DeLuna*, 334 Ill. App. 3d at 20, 777 N.E.2d at 598.

We agree with *DeLuna* and thus reject defendant's attempt to recharacterize his foundational argument as a challenge to the sufficiency of the evidence. See *People v. Besz*, 345 Ill. App. 3d 50, 54-55, 802 N.E.2d 841, 845-46 (2003) (relying on *DeLuna* and rejecting the defendant's attempt to recharacterize a foundational argument as a sufficiency-of-the-evidence claim); see also *People v. Hill*, 345 Ill. App. 3d 620, 632, 803 N.E.2d 138, 148 (2003) (adhering to *DeLuna* and *Besz*).

In *Hill*, 345 Ill. App. 3d at 630-33, 803 N.E.2d at 147-49, the First District recently addressed a defendant's foundational challenge to expert testimony to which the defendant stipulated. The court held that a defendant who stipulates to an expert's opinion at trial forfeits his right to challenge on appeal the foundation for the expert's opinion. *Hill*, 345 Ill. App. 3d at 630, 803 N.E.2d at 147. In so holding, the court reasoned that a defendant forfeits any issue as to the impropriety of evidence if he procures, invites, or acquiesces in the admission of that evidence. *Hill*, 345 Ill. App. 3d at 631, 803 N.E.2d at 147. The *Hill* court also stated, in pertinent part, as follows:

> "[S]everal characteristics unique to stipulations further support our holding. First, had [the] defendant made a timely objection at trial and not agreed to the State's stipulation, the trial court could have addressed this foundational issue and the State could have corrected the deficiency. [Citation.] By presenting the chemist's testimony through a stipulation, in a brief and summary fashion, the result was to remove from the case any issue concerning the expert's testimony. [Citation.] See also *People v. Polk*, 19 Ill. 2d 310, 315, 167 N.E.2d 185, 188 (1960) (finding that the 'stipulation had the effect of eliminating proof which otherwise might have been required'). Additionally, the State likely would not have agreed to the stipulated testimony, thereby foregoing the opportunity to place the expert on the witness stand and ask him to describe in detail the number and type of tests performed on the substance, if the stipulation was not intended to eliminate the need for defending his testimony against a challenge by defendant. [Citation.] Further, we assume that defense counsel, by agreeing to the stipulation, decided to forego the opportunity to cross-examine the expert to focus on other theories and aspects of the defense." *Hill*, 345 Ill. App. 3d at 632, 803 N.E.2d at 148.

■ We fully agree with the *Hill* court's holding and reasoning. We further note that by stipulating to a fact—for example, as in this case, that the substance tested was cocaine—the parties dispense with the need to further stipulate to the foundation underlying that fact. In

other words, because a stipulation is a substitute for the witness's actual testimony, all of those matters that the witness could have and should have testified about are encompassed by the stipulation. Thus, if a defendant and the State agree to stipulate that the forensic chemist tested a substance and determined its weight and content, they eliminate any issue as to that expert's testimony, such as (1) the expert's qualifications, (2) what tests she performed on the substance, (3) whether the tests actually performed were of a type generally accepted and relied upon in the field, and (4) whether the equipment used to perform the tests was functioning properly when the tests were performed. We note, however, that by stipulating to a witness's testimony, the parties do not stipulate to matters that are not necessarily implicated by the stipulation. For instance, in this case, where the stipulation was meant to take the place of the forensic chemist's testimony, the stipulation did not encompass the chain of custody up to the time the forensic chemist received People's exhibit No. 1.

Accordingly, under the circumstances of this case, we conclude that because defendant stipulated to Stiefvater's expert testimony that the substance contained 1.8 grams of cocaine, he cannot challenge on appeal the foundation for Stiefvater's testimony.

In so concluding, we note that although stipulations are to be encouraged, clarity and precision of thought should be encouraged as well. These goals can be obtained by ensuring that the stipulation to which the parties agree is both accurate and complete. For example, in this case, it would have been better practice if the trial court had taken the following steps:

(1) The court should have assured that the stipulation explicitly stated that (a) Stiefvater received People's exhibit No. 1, which contained 18 individually wrapped packages containing an off-white chunky substance; (b) Stiefvater tested all 18 packages; and (c) Stiefvater's testing determined that the 18 packages contained a total of 1.8 grams of cocaine.

(2) The court should have required the stipulation to be reduced to writing and then required the parties to agree to the written stipulation. If necessary, the court itself should have written the stipulation.

(3) To avoid any uncertainties as to the scope of the stipulation, the court should have made clear on the record exactly what the stipulation encompassed and what it did not encompass. In particular, the court should have noted that the stipulation eliminated any issue as to Stiefvater's testimony but did not address any chain-of-custody issue.

(4) Finally, the court should have informed the jury that the parties agreed upon a stipulation, and then the court should have read the stipulation to the jury.

We further note that defendant's reliance on *People v. Raney*, 324 Ill. App. 3d 703, 756 N.E.2d 338 (2001), is misplaced. In that case, the appellate court concluded that the State failed to establish a proper foundation for the admission of the results from a gas chromatography mass spectrometer machine used to test the substance in a drug-possession-with-intent-to-deliver case. Based on that deficiency, the appellate court reversed the defendant's conviction. *Raney*, 324 Ill. App. 3d at 704-05, 756 N.E.2d at 339. However, the forensic chemist in *Raney* actually testified at trial. In addition, defense counsel in *Raney* repeatedly challenged the foundation at trial. *Raney*, 324 Ill. App. 3d at 705, 756 N.E.2d at 340. Thus, *Raney* is simply not applicable to this case, where the parties stipulated to the forensic chemist's testimony. See *Hill*, 345 Ill. App. 3d at 630-31, 803 N.E.2d at 147; *Besz*, 345 Ill. App. 3d at 54, 802 N.E.2d at 845; see also *People v. Washington*, 343 Ill. App. 3d 889, 900, 800 N.E.2d 436, 444 (2003) (all determining that *Raney* was distinguishable because it did not involve stipulated evidence).

As a final matter, we reject defendant's reliance on *People v. Ortega*, 83 Ill. App. 2d 49, 226 N.E.2d 426 (1967), to support his assertion that the stipulation was required to include "the same foundational requirements as would be required had Stiefvater actually testified." In support of that proposition, he specifically cites the following from *Ortega*:

> "[W]e have been impressed by numerous instances in recent years of the demonstrated nonchalance and inattention to detail on the part of prosecutors when introducing by stipulation the part of the State's case having to do with the chain of possession and chemical content of the substance seized in narcotics cases. The expedience of resorting to such a stipulation we do not doubt, but we cannot permit this informality of procedure to render the proof any less exact or complete than would be the case if the witnesses were to testify." *Ortega*, 83 Ill. App. 2d at 51, 226 N.E.2d at 427.

First, we note that *Ortega* did not involve a defendant's foundational challenge to an expert's testimony. Instead, it addressed whether a stipulation was sufficient when it stated that a substance " 'purport[ed] to be' " heroin, rather than that it "was 'found to be' " heroin. *Ortega*, 83 Ill. App. 2d at 51, 226 N.E.2d at 427. Further, to the extent *Ortega* can be construed as holding that when parties stipulate to a forensic chemist's testimony as to the weight and content of a tested substance, the stipulation must explicitly include the same foundational elements as when the chemist actually testifies, we expressly reject it and decline to follow it.

Accepting defendant's proposition and holding that a forensic

chemist's stipulated expert opinion must include every foundational element required when a chemist testified at trial would serve no purpose other than to discourage stipulations, which we refuse to do. In this regard, we reiterate what this court wrote in *People v. Calvert*, 326 Ill. App. 3d 414, 420, 760 N.E.2d 1024, 1029 (2001):

> "A stipulation is 'an agreement between parties or their attorneys with respect to business before a court' (*People v. Buford*, 19 Ill. App. 3d 766, 770, 312 N.E.2d 796, 799 (1974)), and courts look with favor upon stipulations because ' "they tend to promote disposition of cases, simplification of issues[,] and the saving of expense to litigants" ' (*People v. Coleman*, 301 Ill. App. 3d 37, 48, 704 N.E.2d 690, 698 (1998), quoting *In re Estate of Moss*, 109 Ill. App. 2d 185, 192, 248 N.E.2d 513, 516 (1969))."

### 2. *The Testing of All Individually Wrapped Packages*

■ Defendant also argues that Stiefvater's stipulated testimony was insufficient to prove that she tested the contents of all 18 individually wrapped packages. We disagree.

" 'A stipulation is to be given its natural and ordinary meaning.' " *People v. Horton*, 143 Ill. 2d 11, 21, 570 N.E.2d 320, 324 (1991), quoting *People v. Joe*, 31 Ill. 2d 220, 226, 201 N.E.2d 416, 419 (1964). In this case, Stiefvater's stipulated testimony provided that (1) Stiefvater received People's exhibit No. 1 (which was the clear plastic bag containing the individually wrapped packages) in a sealed condition; (2) she determined that People's exhibit No. 1 contained 18 plastic Baggies; (3) she tested the contents of People's exhibit No. 1; and (4) the contents of the plastic Baggies contained "1.8 grams of off-white chunk substance, being the net weight of chunky substance, cocaine being present as the base." Giving the stipulation its natural and ordinary meaning, we conclude that it adequately shows that Stiefvater tested all 18 of the individually wrapped packages.

Moreover, to the extent that the stipulation could be viewed as ambiguous regarding whether Stiefvater tested all 18 packages, defense counsel cured any ambiguity during the following colloquy that took place outside the jury's presence and after the stipulation was read to the jury:

> "[DEFENSE COUNSEL]: There is—there is one other matter I wanted to just—I want to inform the court so the court is aware of it, I have examined a transcript of the lab witness's testimony, [and it] does appear from the transcript at the previous trial that she had tested all 18—
>
> [PROSECUTOR]: Yes.
>
> [DEFENSE COUNSEL]: —[B]aggies. And so we weren't—there had been an attack available in the case law concerning whether

this had been selective testing as far as the gram weight of things[,] and I was aware of [that] at the time I made the stipulation.

THE COURT: All right. Thank you.

[PROSECUTOR]: If she had testified[,] I would have brought that out, but—

[DEFENSE COUNSEL]: Yes."

In light of defense counsel's express concession that Stiefvater tested all 18 individually wrapped packages, we conclude that defendant cannot now challenge the stipulation on the ground that it failed to so indicate. See *People v. Caffey*, 205 Ill. 2d 52, 114, 792 N.E.2d 1163, 1202 (2001) (when a party procures or invites the admission of evidence, he cannot challenge on appeal the admission of that evidence).

## B. Defendant's Claim That the State Failed To Establish a Proper Chain of Custody

Defendant also argues that the State failed to establish a proper chain of custody for the admission of People's exhibit No. 1 (the clear plastic bag containing 18 individually wrapped packages of cocaine) because (1) a discrepancy existed as to the number of individually wrapped packages seized by Thompson and the number tested by Stiefvater and (2) no witness testified as to what inventory number was assigned to People's exhibit No. 1. We disagree.

■ Before the trial court may admit real evidence at trial, the State must provide an adequate foundation either by way of live testimony or stipulation that establishes that (1) the item sought to be admitted is the actual item involved in the alleged offense and (2) the item's condition is substantially unchanged. If an item is not readily identifiable or is susceptible to alteration by tampering or contamination, the State must establish its chain of custody with sufficient completeness to render it improbable that the original item has either been exchanged, contaminated, or tampered with. *People v. Fox*, 337 Ill. App. 3d 477, 481, 786 N.E.2d 563, 567 (2003).

Unless the defendant produces actual evidence of tampering, substitution, or contamination, the State need only establish a probability that tampering, substitution, or contamination did not occur, and any deficiencies go to the weight rather than the admissibility of the evidence. *People v. Herrero*, 324 Ill. App. 3d 876, 882, 756 N.E.2d 234, 241 (2001).

■ The purpose of protective measures is to ensure that the substance recovered from the defendant was the same one as the substance tested by the forensic chemist. *Fox*, 337 Ill. App. 3d at 481-82, 786 N.E.2d at 567. Proof of delivery, presence, and safekeeping demonstrates that reasonable measures were taken to protect the

evidence. *People v. Gibson*, 287 Ill. App. 3d 878, 882, 679 N.E.2d 419, 422 (1997). The State is not required to exclude every possibility of tampering, nor does it need to present every individual involved in the chain of custody. *Fox*, 337 Ill. App. 3d at 482, 786 N.E.2d at 567.

■ In this case, defendant did not produce actual evidence of tampering, substitution, or contamination. Thus, the State had the burden to prove the chain of custody with sufficient completeness to establish a probability that (1) reasonable measures were employed to protect the evidence from the time it was seized and (2) it was improbable the evidence was altered. *Fox*, 337 Ill. App. 3d at 481, 786 N.E.2d at 567.

Having thoroughly reviewed the record, we conclude that the State proved the chain of custody with sufficient completeness to establish a probability that (1) the police used reasonable measures to protect People's exhibit No. 1 from the time Thompson retrieved it from the trash can until Stiefvater received it and (2) it was improbable that People's exhibit No. 1 was altered or substituted. In so concluding, we reject defendant's contention that a discrepancy in the number of individually wrapped packages seized versus the number tested rendered the State's chain of custody insufficient. Although Wasson initially testified that the clear plastic bag contained 19 individually wrapped packages, he later testified that the total was either 18 or 19. Thus, his final testimony on that issue did not result in a discrepancy as to the number of individually wrapped packages that was fatal to the State's chain of custody. Instead, any discrepancy simply went to the weight of the evidence. See *People v. Carroll*, 227 Ill. App. 3d 144, 147-48, 590 N.E.2d 1010, 1013 (1992) (Baggies of cannabis were admissible despite police officer's unclear and inconsistent testimony as to the number of Baggies recovered and processed as evidence).

Nor do we agree with defendant that the lack of testimony as to the specific inventory number assigned to People's exhibit No. 1 rendered the State's chain-of-custody evidence insufficient. In this regard, we note that Soderstrom identified the inventory tag he filled out for People's exhibit No. 1, which was attached to the paper bag when he placed it in the evidence locker. Further, as earlier stated, Soderstrom identified exhibit No. 1 based on (1) his handwriting on the inventory tag and (2) his recollection of filling out the tag for that particular item of evidence. Thomason also identified People's exhibit No. 1 and the inventory tag that was still attached to it after it had been sent to, and returned by, Stiefvater. This evidence was sufficient to establish a reasonable probability that the evidence was not altered or substituted. See *Herrero*, 324 Ill. App. 3d at 882, 756 N.E.2d at 241.

## C. The Trial Court's Juror-Replacement Procedure

■ Defendant next argues that the trial court erred by replacing Gilpin with Lewis after the jury began deliberating. Specifically, he contends that the court violated section 115—4(g) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—4(g) (West 2000)) and Supreme Court Rule 434(e) (134 Ill. 2d R. 434(e)), both of which provide, in pertinent part, that "[i]f before the final submission of a cause," a juror dies or is discharged, the trial court shall replace him with an alternate juror. Defendant also asserts that the court compounded its error by failing to (1) ascertain whether Lewis had discussed the case with anyone or formed an opinion and (2) instruct the jury to begin its deliberations anew. Defendant concedes that by failing to raise a timely objection at trial or in his posttrial motion, he has forfeited this issue on appeal. Nonetheless, he urges us to review it under the plain-error rule.

■ Our supreme court has addressed the issue of plain error as follows:

" ' "[B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " [Citation.] "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." ' " *People v. Crespo*, 203 Ill. 2d 335, 348, 788 N.E.2d 1117, 1124 (2001), quoting *United States v. Cotton*, 535 U.S. 625, 631-32, 152 L. Ed. 2d 860, 868, 122 S. Ct. 1781, 1785 (2002), quoting *Johnson v. United States*, 520 U.S. 461, 467, 137 L. Ed. 2d 718, 727, 117 S. Ct. 1544, 1549 (1997).

See *People v. Keene*, 169 Ill. 2d 1, 17, 660 N.E.2d 901, 909-10 (1995) ("Plain error marked by 'fundamental [un]fairness' occurs only in situations which 'reveal breakdowns in the adversary system,' as distinguished from 'typical trial mistakes.' [Citation.]").

■ This court will take our supreme court at its word and find plain error only in exceptional circumstances in which " ' "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." ' " *Crespo*, 203 Ill. 2d at 348, 788 N.E.2d at 1124, quoting *Cotton*, 535 U.S. at 631, 152 L. Ed. 2d at 868, 122 S. Ct. at 1785, quoting *Johnson*, 520 U.S. at 467, 137 L. Ed. 2d at 727, 117 S. Ct. at 1549. The alleged error in this case falls far short of this standard. In so concluding, we note that (1) Lewis (a) was subject to the same selection procedure as the other jurors, (b) took the same oath as the other jurors, and (c) heard the evidence and was instructed on the law; (2) the trial court explicitly admonished Lewis that (a) it was not

completely discharging her as an alternate juror and (b) she should not talk with anyone about the case until the court knew whether Gilpin could complete his service; (3) defense counsel had no objection to, or concern about, the court's juror-replacement procedure; (4) Lewis had been released for only 45 minutes before being recalled; (5) although the record does not show where Lewis spent those 45 minutes, it does indicate that (a) during that time, she was "isolated and separated from the other jurors" and (b) when Gilpin could not continue, Lewis was "immediately available"; (6) after Lewis replaced Gilpin, the jury deliberated for almost 4½ hours before reaching a verdict; and (7) nothing in the record shows that Lewis (a) had impermissible contact with an outsider that prejudiced defendant, (b) was coerced by a jury that had already come to a decision, or (c) was unable or unwilling to render a fair decision.

We find support for our decision in *People v. Henderson*, 45 Ill. App. 3d 798, 359 N.E.2d 909 (1977). In that case, the defendant was tried before a jury of 12 regular and 2 alternate jurors. After instructing the jury, the trial court discharged the two alternate jurors, and the remaining jurors began deliberating. About 2½ hours after deliberations began, one of the jurors suffered a heart attack. The court stopped deliberations and recalled the two alternate jurors. The court then questioned the alternate jurors about their activities during the 2½-hour period. The first alternate admitted talking to his wife about the case but stated that his wife expressed no opinion. The first alternate also denied having reached a decision regarding the defendant's guilt or innocence. The court then recalled the first alternate, and five hours later, the jury returned a guilty verdict. *Henderson*, 45 Ill. App. 3d at 800, 359 N.E.2d at 911.

On appeal, the *Henderson* court first concluded that the defendant had forfeited his right to challenge the "mere irregularity" of the trial court's juror-replacement procedure by acquiescing in the court's actions. *Henderson*, 45 Ill. App. 3d at 801-02, 359 N.E.2d at 912-13. The court further concluded that the court's replacement of the sick juror after deliberations had begun did not constitute plain error where the defendant failed to show that he suffered prejudice. *Henderson*, 45 Ill. App. 3d at 805, 359 N.E.2d at 915. In this regard, the court noted that (1) defense counsel acquiesced to the juror-replacement procedure; (2) the trial court had thoroughly examined the alternate to assure his impartiality prior to replacing the sick juror; (3) the reconstituted jury deliberated for five hours before reaching a verdict; and (4) no evidence showed that the alternate juror could not render a fair decision.

Similarly, in this case, nothing in the record indicates that defendant was prejudiced by the trial court's replacing Gilpin with Lewis.

## D. The Trial Court's Reliance on Evidence Outside the Record in Denying Defendant's Posttrial Motion

 Defendant also argues that the trial court erred by relying on evidence outside the record in denying his motion for a judgment of acquittal or a new trial. Specifically, defendant contends that the court improperly relied on Cox's testimony from his first trial in rejecting his sufficiency-of-the-evidence claim, thus denying him due process and entitling him to a remand for a new hearing on his posttrial motion. We are not persuaded.

In support of his argument, defendant cites *People v. Mitchell*, 152 Ill. 2d 274, 323, 604 N.E.2d 877, 901 (1992), in which the supreme court concluded that the defendant's due-process rights were violated because the trial court failed to recall certain testimony in denying the defendant's motion to suppress his confession. In that case, the trial court expressly based its denial of the defendant's motion to suppress on its belief that the defendant never testified that he (1) believed he was not free to leave the police station or (2) was denied permission to leave police custody. Contrary to the court's understanding, the record showed that the defendant in fact testified that he believed he was not free to leave police custody. *Mitchell*, 152 Ill. 2d at 321-22, 604 N.E.2d at 900-01.

On appeal, the supreme court concluded that the defendant's due-process rights were violated because the trial court clearly failed to recall the crux of the defendant's testimony regarding the decisive issue of whether he was free to leave police custody. The supreme court reasoned that if the trial court had recalled, considered, and believed the defendant's testimony, that testimony would have supported the defendant's claim of illegal seizure, and the trial court thus should have suppressed his confession. *Mitchell*, 152 Ill. 2d at 322, 604 N.E.2d at 901. Ultimately, however, the supreme court determined that the error was harmless in light of other evidence that supported a guilty verdict. *Mitchell*, 152 Ill. 2d at 326, 604 N.E.2d at 903.

In this case, defendant filed a motion for a judgment of acquittal or a new trial, arguing that the State failed to (1) prove that he had intent to deliver the cocaine and (2) establish a sufficient chain of evidence for People's exhibit No. 1. At an October 2002 hearing on that motion, defense counsel argued, in part, that the State failed to prove beyond a reasonable doubt that defendant intended to deliver the cocaine. In that regard, defense counsel argued that the State's evidence was "a little sparse" because "there was one officer who had been to a seminar or two who said that he had had training and that apparently [the] number [of individually wrapped packages] made an inference of possession with—or that the packaging was for sale or distribution."

In denying defendant's motion, the trial court commented on testimony presented by Cox at defendant's first trial, not his second trial, which is the subject of this appeal. The court specifically commented on Cox's testimony, in pertinent part, as follows:

> "The officer who testified was a 24[-]year officer with the Danville [p]olice [d]epartment who *** since 1977 when he began[;] he had been to every narcotics class that had been offered for police officers in the area that he knew of. He had over 500 hours of training, 2 years in the metropolitan enforcement group as an undercover officer, several hundred of his own contact[s] of drug dealers and users on a regular basis in the street, [and] was well-familiar with the process of packaging and selling the rocks. [The cocaine] [r]ecovered [was] packaged in what were referred to as dime bags. *** So the bottom line, as he put it, was that this had been broken down for sale ***."

The trial court here obviously erred by referring to Cox's testimony from defendant's first trial when discussing the sufficiency of the evidence at defendant's second trial. However, unlike in *Mitchell*, had the court recalled and considered Wasson's testimony (as opposed to Cox's testimony in the first trial), we have no reason to believe that the court's decision on defendant's motion would have been different. In this regard, we note the following: (1) although Wasson did not have as much experience in drug enforcement as did Cox, no one questioned his qualifications to give an opinion regarding whether the 1.8 grams of cocaine was packaged and intended for sale; and (2) Wasson opined that based on the amount of cocaine that defendant possessed and the manner in which the cocaine was packaged, the individually wrapped packages were for sale, not personal use. See *People v. Abdullah*, 336 Ill. App. 3d 940, 947-48, 949-50, 785 N.E.2d 863, 870, 871 (2002) (in ruling on a motion for a judgment of acquittal, the court should look at all of the evidence in the light most favorable to the State, asking whether a reasonable person could fairly find the defendant guilty; in ruling on a motion for a new trial, the court should consider whether the jury's verdict was supported by the evidence). Because the court's decision would not have been different had the court corrected its error and considered Wasson's testimony, we conclude that defendant was not denied due process. We thus deny defendant's request to remand this case for a new hearing on his posttrial motion.

### E. Sufficiency of the Evidence

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

## F. Defendant's Claim That He Received Ineffective Assistance of Trial Counsel

Last, defendant argues that he received ineffective assistance of trial counsel. Specifically, he contends that his counsel was ineffective in that he (1) should have filed a motion to suppress the seized cocaine and his statements to Cox on the ground that police lacked probable cause to arrest him in the first instance and (2) failed to cross-examine Wasson as to defendant's intent to deliver.

■ Ineffective-assistance-of-counsel claims are judged under the now-familiar standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To establish ineffective assistance of counsel, a defendant must first demonstrate that his defense counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In so doing, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. Second, a defendant must demonstrate a reasonable probability that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. *People v. Coleman*, 183 Ill. 2d 366, 397-98, 701 N.E.2d 1063, 1079 (1998).

In *People v. Kunze*, 193 Ill. App. 3d 708, 726, 550 N.E.2d 284, 296 (1990), this court held that adjudication of a claim of ineffective assistance of counsel is often better made in proceedings on a petition for postconviction relief, where a complete record can be made. In *Kunze*, 193 Ill. App. 3d at 725, 550 N.E.2d at 296, the ineffective-assistance-of-counsel claim turned on whether the defendant would have testified had he known in advance that the State would use his prior convictions to impeach him. Because nothing in the record permitted such a determination to be made, this court declined to adjudicate the defendant's claim. *Kunze*, 193 Ill. App. 3d at 725-26, 550 N.E.2d at 296.

In addition, in *Massaro v. United States*, 538 U.S. 500, 155 L. Ed. 2d 714, 123 S. Ct. 1690 (2003), the United States Supreme Court provided a thorough analysis regarding why it is preferable that ineffective-assistance claims be considered on collateral review rather than on direct appeal. In that case, the Supreme Court considered the

rule of the Second Circuit Court of Appeals requiring that a defendant who is represented by new counsel on appeal raise any ineffective-assistance-of-counsel claims on direct appeal if ineffectiveness was evident from the record. *Massaro*, 538 U.S. at 500, 155 L. Ed. 2d at 719-22, 123 S. Ct. at 1693-95. The Supreme Court rejected that rule, stating, in pertinent part, as follows:

> "When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. Under [*Strickland*], a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. See [*Guinan v. United States*, 6 F.3d 468, 473 (7th Cir. 1993)] (Easterbrook, J., concurring) ('No matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did .... Or it may turn out that counsel's overall performance was sufficient despite a glaring omission ...')." *Massaro*, 538 U.S. at 504-05, 155 L. Ed. 2d at 720, 123 S. Ct. at 1694.

See *People v. Holloman*, 304 Ill. App. 3d 177, 186, 709 N.E.2d 969, 975 (1999) (in which this court declined to address on direct appeal whether trial counsel's failure to file a motion to suppress evidence constituted ineffective assistance where the record contained nothing to review with respect to the officer's actions or the defendant's standing to raise fourth amendment issues).

 Similarly, in this case, whether defendant suffered prejudice for his trial counsel's failure to move to suppress evidence arising from defendant's arrest depends on the likelihood of the motion's success. However, the record is devoid of factual findings on the issues pertinent to defendant's claim. Because the record contains nothing to review with respect to the appropriateness of the police officers' actions surrounding defendant's arrest, we decline to consider defendant's argument. In so doing, we note that the argument defendant makes is almost never appropriate on direct appeal because absent a motion to suppress, it is highly unlikely that the State would garner its resources to prove the propriety of the officers' actions. Thus, in

such cases, we cannot be certain that the record contains all of the evidence that could have been presented on the issue.

The record also contains nothing to review with respect to (1) why defense counsel chose to cross-examine Wasson in the manner he did or (2) whether counsel's decision to cross-examine Wasson as he did constituted a sound trial tactic or incompetence. Further, other than two questions that Wasson was asked at defendant's first trial—namely, (1) whether a drug user could use 1.8 grams of cocaine in less than one week; and (2) whether a person could buy 1.8 grams of cocaine already packaged in 18 individual packages—the record does not suggest how Wasson would have answered the questions that defendant claims counsel should have asked. Because the answers to the questions pertinent to defendant's claim are currently *de hors* the record, we decline to consider them. Instead, defendant may pursue his claim under the Post-Conviction Hearing Act (725 ILCS 5/122—1 through 122—8 (West 2002)). See *People v. Cameron*, 336 Ill. App. 3d 548, 552, 784 N.E.2d 438, 441 (2003) (in which this court reaffirmed our decision in *Kunze* and declined to address on direct appeal whether trial counsel's failure to request a certain jury instruction constituted ineffective assistance); *People v. Neylon*, 327 Ill. App. 3d 300, 312, 762 N.E.2d 1127, 1138 (2002) (reaffirming *Kunze* and declining to address on direct appeal whether trial counsel's failure to make an offer of proof constituted ineffective assistance of counsel); *In re Carmody*, 274 Ill. App. 3d 46, 56, 653 N.E.2d 977, 984 (1995) (noting that the record on direct appeal of a criminal case rarely contains any explanation of the tactics of trial counsel, and holding that, if those tactics are to be the subject of scrutiny, a record should be developed in which they can effectively be reviewed).

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and MYERSCOUGH, J., concur.