THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY D. SATTERFIELD, Defendant-Appellant.

Second District No. 2—88—0189

Opinion filed April 12, 1990.—Rehearing denied May 4, 1990.

G. Joseph Weller and Manuel S. Serritos, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis Schumacher, State's Attorney, of Oregon, and Frank Weiss, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Gary Satterfield, was charged by an amended information in the circuit court of Ogle County with the offense of criminal sexual abuse (enhanced to a Class 2 felony due to a prior conviction of the sexual assault offense of rape) (Ill. Rev. Stat. 1985, ch. 38, par. 12—15(a)(1)) and with the offense of aggravated battery (battery occurred in a "public place of accommodation") (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(8)). He was convicted of both offenses after a jury trial and was sentenced to the Department of Corrections for two five-year concurrent terms of imprisonment.

As to his aggravated battery conviction, he contends on appeal that the prosecution failed to prove beyond a reasonable doubt that his conscious objective or purpose was to accomplish insulting or provoking physical contact with the victim. As to his criminal sexual abuse conviction, he contends the prosecution failed to prove the essential elements of force, intent, and his prior felony conviction and, further, there was a fatal variance between the charging instrument and the proof at trial.

The evidence presented at trial showed that about 9:30 a.m. on Tuesday, July 28, 1987, the defendant arrived at the home of his friend, Carl Beightol. According to Beightol, the defendant had an open can of beer with him and, in Beightol's opinion, the defendant "wasn't feeling no [sic] pain at all." The defendant wanted to go to the Polo Veterinary Clinic to find out what to do for a dog he had seen that morning in the yard of a home. The dog was tethered by a leash and its neck was rubbed raw. Beightol had some things to do at the house, so they did not drive to the clinic until afternoon.

Beightol parked his pickup truck in the veterinary parking lot. The defendant got out and walked toward the clinic door. Beightol then saw the defendant walk to the passenger side of another car, which was parked one space away and to the right of Beightol's car. There were two women in the car, an older woman (Ester Nichols), the driver, and a younger woman (the complainant), to whom the defendant was talking. According to Beightol, the defendant had opened the passenger side door and was talking to the complainant. Beightol testified the defendant "leaned over and he grabbed her [the complainant], put his hand under her jaw like this, and shook her head." Beightol estimated the defendant shook the complainant's head three or four times.

Beightol stated it was raining, and with the windows rolled up, he did not hear any part of the defendant's conversation with the com-

plainant. The defendant then got back into Beightol's truck and advised him he wanted to go to Mick's, a bar in Polo. On cross-examination, Beightol affirmed that he saw no conduct other than the defendant hold the complainant's head under her chin and shake her head.

Ester Nichols, the complainant's foster mother, testified she took the complainant, age 15, to the Polo Veterinary Clinic to get treatment for the complainant's dog, which had been struck by a moving vehicle. Nichols described her daughter as "crying really hard." Nichols testified her daughter left the car to see if the clinic was open; as she returned to the car, the defendant followed her.

According to Nichols, the defendant

"leaned in the car and put his left arm around [the complainant's] shoulders and he shook her neck real hard with his right hand, and then he said, well, I'm sorry I did that but I could have done this, so then he touched her breasts with his hand three or four times with his fingers."

Nichols proceeded to start the car and tried to back away "but it didn't seem like he would get away, because he still had the door part open." Eventually, the defendant backed away, and the complainant rolled up the window and locked the door.

On cross-examination, Nichols reiterated that the defendant seized the complainant by the throat and shook her, and, with three fingers, he "poked" or "jabbed" complainant's left breast three or four times. Nichols related that she had seen the defendant before but did not recognize him until he mentioned his name. She knew his name; he had been to her house to visit one of her sons.

The complainant described the incident as follows:

"I got out of the car and I went up to the door to go and see if the vet was there, but nobody was in there, and I was crying because my dog had gotten hit, and so I turned around and I went towards the car, and the man got out of the truck, and he come [sic] like I was—I had gotten back in the car when I noticed he was standing at the door, and he was mumbling and I couldn't make out what he was mumbling, and he comes [sic] toward the car and he kept on talking, and then he like opens the door, and he put his arm around me, his left arm around my shoulders and he was looking at the dog and he was saying things like, well, your dog has no soul, and don't worry about it. Just go home and give it some pain killers and he'll be okay, and I was like really scared, and that, then he said, well, just don't worry about it, and he took his right arm and he grabbed like the skin of my neck and he shook it like this, and I was

really scared, and he says, don't cry, just don't worry about it, and he says, he says, well, I could have done this, and then he poked my breast right here, somewhere, it was down lower."

The complainant testified the defendant used two or three fingertips of his right hand in touching her breast. She related that she was very frightened while he was poking her: "I couldn't do anything. He was in the door and I had a dog on my lap and my mom was sitting next to me."

On cross-examination, the complainant testified she was frightened "because my dog was bleeding and because I had never seen this man before, and I didn't know what to do." When the defendant asked what happened to her "little doggie," she told him her dog had been struck by a van, and he put his arm around her shoulder. She did not say anything to him about that because she was frightened and did not know what to do. She stated she thought "what he was meaning to do is to comfort me by putting his arm around my shoulder." Complainant demonstrated her lack of approval toward defendant's gesture by "tightening up" because there was no place to which she could move. She stated the defendant grabbed the skin underneath her chin with his fingers and thumb of his right hand and shook it three or four times "just enough to—he was, I think, I believe, he was trying to, you know, like when you try to slap somebody when they are crying for something." Complainant testified further that "[a]t that moment, I was not sure what he was trying to do. I had thought that maybe he was trying to help me after that, days after that."

The complainant estimated that the entire incident lasted five or six minutes. She did not tell the defendant to go away but instead advised him, "[w]e're leaving now, excuse me, good bye." The mother started the car and pulled away; the defendant made no effort to hold her.

Defense counsel moved for a directed verdict, arguing as to the sexual abuse charge that no force or threat of force was shown and that "poking" was not sexual conduct. As to the aggravated battery charge, he argued the clinic parking lot was not a public place of accommodation and the testimony was not clear as to whether the touching constituted a battery. Following the prosecutor's argument, the court denied the defendant's motion as to the aggravated battery, and, early the next day, it also denied his motion as to the criminal sexual abuse charge.

The defendant's case consisted of a stipulation and his own testimony. He stipulated that Al Beightol, Carl Beightol's father, would

testify that he had knowledge of the dog that the defendant was concerned with trying to help.

In his own behalf, defendant testified he got out of Beightol's pickup truck and walked to the clinic door to determine the office hours. The complainant, carrying a box, was there also. She was crying and appeared to be emotionally upset. The defendant opened the front passenger door to Nichols' car so the complainant could get in. He recognized Nichols, who was the mother of one of his friends. He testified:

> "I was trying to calm down the girl, and I asked what was the matter, and she said that her doggie was going to have to get put to sleep, and I told her it wasn't, you know, it wasn't the end of the world, and she could get another doggie, or something, and then I told her that dogs and animals don't have a soul and spirit, and its in the *Bible*, it's not crazy. God breathed life into man, not animals' soul and spirit rather." (Emphasis in original.)

He believed he probably put his hand on complainant's shoulder; she did not squirm or make any motion when he did that. He asked to see the complainant's dog, which she had in a box on her lap, the dog covered by a blanket. The defendant saw no blood on the dog or other injury. He advised her to call the veterinarian's residence. He looked at the dog, and it whined at him. The defendant told the complainant, "the doggie didn't want to die, just take the doggie home and love it, and, you know, it will probably get better."

The defendant testified he thought Mrs. Nichols said something then, he did not remember what, but he believed he said in response:

> "[T]hat I was only trying to help, and then, because I kind of sometimes have a snide remark or smart remark \*\*\* to say \*\*\*.
>
> * * *
>
> I said if I was trying to do something wrong, that I might play with her breasts, or something, and then with my left hand, because I was leaning over inside the car, because it was raining, and I was getting wet, in my trying to help, since I was leaning over in front of her, I touched her on the upper chest, right here, with my left hand, because it was the closest to her, and my hand now, for sure, wasn't on her shoulder, or around her. I touched her with the side of my left hand, and after that, she didn't cry anymore. She straightened up. I guess I accomplished what I was trying to accomplish all along, was to calm her down, because she didn't need to be that upset

over an animal or something. Sure, you get upset, but you can't stay that way. You can't cope."

After he touched the complainant, she stopped crying and did not cry anymore. Neither she nor her mother gave him any signals that what he was doing was not right. The defendant testified the chin-touching incident occurred on his return to the car after he volunteered to check the office hours posted on the door. Both women indicated they wanted him to check the hours. When he returned to the car, the door was shut and the complainant rolled down her window. He told the women there was supposed to be someone at the clinic until 5 p.m. and that they should call the vet's house and give the dog some crushed aspirin mixed in its food. As he was telling this to the women, he placed his hand on top of the complainant's head. In trying to get her attention, he lifted her head up with his right hand under her chin. He did not remember shaking her, "but, you know, I may have done a little something like that. *** It was just something to—meant to get [her] attention and help calm [her] down." Through the whole five-minute incident, there was no indication by Nichols or the complainant that he was bothering them. Finally, the defendant admitted that he had prior felony convictions.

On cross-examination, the defendant maintained he meant no harm to the complainant; he was merely trying to comfort her and be a good person. He stated he was not intoxicated at the time of the incident, but admitted he had four or five beers prior to it. He stated he leaned into the car only in order to shelter himself from the rain. He denied he touched the complainant's breast but, rather, touched her upper chest with the side of his hand. When asked why he would do that when the complainant was crying because her dog was dying, the defendant replied, it "[s]traightened her up. She didn't cry any more." On re-cross-examination, the defendant testified that he was 35 years old.

Ester Nichols testified in rebuttal in part that the defendant took hold of the complainant's chin and neck and shook her head before he went to the door of the clinic to check the hours.

Following deliberations, the jury returned with guilty verdicts on both charges, and judgment was entered on the verdicts. Following a presentence investigation and a psychiatric evaluation, the defendant was sentenced as noted above. The court denied the defendant's subsequent post-trial motions raising the issues of whether the parking lot was a public place of accommodation and whether sexual conduct occurred.

The defendant first contends his conviction of aggravated battery

must be reversed because the evidence was insufficient to show the requisite intent and the nature of the conduct. The information charged the defendant with aggravated battery in that he

> "without legal justification and while [the complainant] was at the Polo Veterinarian Clinic, a public place of accommodation, *knowingly* made physical contact of an insulting or provoking nature with [the complainant] in that he grabbed [the complainant] by the throat with his hand." (Emphasis added.)

See Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(8).

Defendant argues the evidence leaves considerable doubt about whether his actions constituted contact of an insulting or provoking nature as opposed to merely a well-intentioned effort to comfort the complainant in light of the circumstances of her dog's injury. Although he acknowledges he did not know the complainant, he argues he was acting as a "good Samaritan" for Nichols, whom he did know. He points to the fact neither the complainant nor her mother made a verbal or affirmative physical objection to his conduct as being supportive of his contention that he lacked the specific intent required to sustain a conviction of battery.

■◀■ The defendant correctly notes that battery is a specific intent crime. (*People v. Hayes* (1976), 37 Ill. App. 3d 772, 774.) That is, the contact must be made intentionally or knowingly (Ill. Rev. Stat. 1985, ch. 38, par. 12—3(a); *Hayes*, 37 Ill. App. 3d at 774); the defendant must know what he is doing before his conduct will be considered an offense. (*People v. Weir* (1985), 131 Ill. App. 3d 562, 564.) "A person knows, or acts knowingly or with knowledge of *** [t]he result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." (Ill. Rev. Stat. 1987, ch. 38, par. 4—5(b).) When the sufficiency of the evidence is challenged, it is not the function of the reviewing court to retry the defendant. The relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237.

■ Viewing the evidence in the light most favorable to the State, we conclude the defendant knowingly made contact of an insulting or provoking nature with the complainant. Despite his alleged good intentions, the defendant quite clearly made objectionable physical contact with a young woman he admitted he did not know. Nichols and the complainant testified his initial contact was his left arm around the complainant's shoulders and the shaking of her head by grasping

her neck. The defendant testified his initial contact was a hand on her shoulder and that it was only later that he lifted up her chin and may have done something like shake her head in order to get her attention and calm her down. Whatever the sequence of events—a question for the jury to resolve along with the witnesses' credibility—the evidence refutes his contention he received no affirmative signal that his initial contact with the complainant was objectionable. Nichols and the complainant each testified and the defendant admitted that he stated: *"Well, I could have done this"* and he then proceeded to make contact of an even more insulting and provoking nature by poking or jabbing at the complainant's left breast. (Emphasis added.) Defendant's statement clearly suggests he knew he already had done something objectionable. During the defendant's contact with the complainant, she testified she was frightened and could not move away from him because she was boxed in, so she "tightened up." Also, Nichols testified she was trying to back out of the parking space away from the defendant, but that the car door was open.

 █ Although the contact made with the complainant's neck in the instant cause did not have the sexual overtones of the contact which occurred in *People v. Margiolas* (1983), 117 Ill. App. 3d 363, *People v. Siler* (1980), 85 Ill. App. 3d 304, or *People v. Hamilton* (1980), 81 Ill. App. 3d 297, 301, contact which is insulting or provoking in nature is not limited to sexually oriented contact but includes the slightest intentional or knowing unlawful touching. (Ill. Ann. Stat., ch. 38, par. 12—3, Committee Comments, at 439 (Smith-Hurd 1979).) The defendant and the complainant here were complete strangers to each other. Yet, because he was acquainted with the son of the other woman in the car with the complainant, the defendant took it upon himself to "comfort" the complainant by making physical contact with her before he knew who she was or even what was causing her to cry. His own characterization of his conduct as "officious"—although astute—is, nonetheless, an understatement. "Officious" is defined as "objectionably forward in offering one's unrequested and unwanted services, help or advice." (The Random House Dictionary of the English Language 1000 (1983).) The defendant's conduct—emboldened, no doubt, but not excused, by the four or five beers he had consumed—went beyond officious, right into criminal. We conclude his conviction of aggravated battery was supported by sufficient evidence.

The defendant next contends the State failed to prove his guilt beyond a reasonable doubt of the offense of criminal sexual abuse in that it failed to prove the requisite elements of force and intent and,

further, there was a fatal variance between the information filed and the proof at trial.

The amended information charged the defendant violated section 12—15(a)(1) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 12—15(a)(1)) in that he

"committed an act of sexual conduct with [the complainant] in that [he], by the use of force knowingly touched the breast of [the complainant] for the purpose of the sexual arousal of [himself] or [the complainant]; after [he] had previously been convicted of the sexual assault offense of rape in the 15th Judicial Circuit of the State of Illinois in Ogle County, court file number 78—DF—78."

■ As to the element of force, defendant argues neither the complainant nor her mother testified to any conduct of his intervening between the shaking of the complainant's neck or head and the touching of her breast. The statute defines force, however, to include overcoming the victim by the use of physical restraint or confinement. (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(d)(2).) Here, the complainant testified there was nowhere she could move in order to avoid the defendant's advances. She virtually was pinned in the car and, thus, was physically confined within the meaning of the statute.

■ As to intent, the statute defines an act of "sexual conduct" in pertinent part as "any intentional or knowing touching *** by the *** accused *** of the *** breast of the victim *** for the purpose of sexual gratification or arousal of the victim or the accused." (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(e).) The defendant argues his touching of the complainant's breast three or four times in the context of the instant cause was not for the purpose of sexual gratification or arousal of the victim or himself. Rather, "he merely wanted to make the point that his act of shaking complainant's head was not meant to be alarming."

■ The defendant's own explanation of the point he wished to make to the complainant's mother, Mrs. Nichols, reveals the wolf in sheep's clothing: "Well, if I was trying to do something *wrong*, [then] I might play with her breasts or something." The defendant's subsequent unnecessary illustration of his point by engaging in the act which he himself described as "wrong" betrayed an ulterior intent to obtain a measure, however slight, of sexual gratification.

Accordingly, we conclude the State's evidence proved his guilt beyond a reasonable doubt of the offense of criminal sexual abuse.

The question of the variance between the information and the proof at trial arises by virtue of the fact the jury received the defini-

tional and issues instructions relating to subsection (b)(1) of section 12—15 of the Code (relating to the certain ages of the accused and the victim), rather than subsection (a)(1) (used force or threat of force) as charged in the information. Subsection (b)(1) provided:

"The accused commits criminal sexual abuse if:

(1) the accused was 17 years of age or over and commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 16 years of age when the act was committed." (Ill. Rev. Stat. 1985, ch. 38, par. 12—15(b)(1).)

In contrast, subsection (a)(1) provided:

"The accused commits criminal sexual abuse if he or she:

(1) commits an act of sexual conduct by the use of force or threat of force." Ill. Rev. Stat. 1985, ch. 38, par. 12—15(a)(1).

Pursuant to People's instructions Nos. 13 and 14 (Illinois Pattern Jury Instructions, Criminal, Nos. 11.36, 11.37 (2d ed. Supp. 1987)) (IPI Criminal 2d (Supp. 1987)), the jury was instructed, in pertinent part:

"A person commits the offense of Criminal Sexual Abuse when he was 17 years of age or older and commits and [sic] act of sexual conduct with a victim who was at least 13 years of age but under 16 years of age when the act was committed." People's Instruction No. 13.

"To sustain the charge of Criminal Sexual Abuse, the State must prove the following propositions:

First: That the defendant committed an act of sexual conduct with [the complainant]; and

Second: That the defendant was 17 years of age or older; and

Third: That [the complainant] was at least 13 years of age but under 16 years of age when the act was committed." People's Instruction No. 14.

The defendant did not object to these instructions and did not tender any of his own. He did not object to withdrawal of People's instruction No. 10, which defined the term "force," to wit, "the term 'force or threat of force' means the use of force or violence, or the threat of force or violence when the accused has overcome the victim by use of physical confinement." (See IPI Criminal 2d No. 11.63 (Supp. 1987).) The defendant also did not raise the instructional issue in either of his post-trial motions, and he raises the issue of variance for the first time in this court.

The record shows the defendant argued the absence of force dur-

ing his motion for a directed verdict after the close of the State's case, but his motion for a directed verdict was not renewed at the close of all the evidence, and he did not argue the absence of force during closing argument. Rather, he stated during closing argument: "There's no doubt about the ages of the people involved here, and so that's pretty easy. I think you can decide that very easily." Thus, it is clear that defendant not only did not object to the erroneous instruction, he did not offer a correct issues instruction, and he acquiesced in the withdrawal of the definitional instruction of force. Finally, he conceded the irrefutability of the ages of the accused and the victim.

 It is axiomatic that a defendant may not complain of error which he invited or in which he acquiesced. (*People v. White* (1985), 134 Ill. App. 3d 262; *People v. Benka* (1983), 117 Ill. App. 3d 221.) The defendant has not challenged the competency of his trial counsel, nor has he argued that the plain-error doctrine should be applied to preserve the issue. (See generally *People v. Berryman* (1988), 171 Ill. App. 3d 548, 559-61.) Consequently, we conclude he has waived this issue.

 Briefly, on the merits, however, the record shows no fatal variance between the information and the proof at trial. The defendant relies on *People v. Veile* (1982), 109 Ill. App. 3d 847, in support of his contention. In *Veile*, the defendant was convicted by a jury upon an information charging aggravated battery causing bodily harm to a police officer. (Ill. Rev. Stat. 1979, ch. 38, pars. 12—4(b)(6), 12—3(a).) On appeal, the defendant claimed the State failed to prove any bodily injury. The court agreed, and it rejected the State's alternate argument that any variance between the charge of bodily harm as opposed to merely insulting touching could not have misled the defendant since she maintained that she did not hit the officer at all. The court noted the State elected to charge the defendant with aggravated battery causing bodily harm and was bound by the information upon which it proceeded to trial. Inasmuch as the court was not called upon to render any opinion as to whether the actions of the defendant constituted a touching of an insulting or provoking nature, it did not so decide.

The defendant here knew what he was charged with and, unlike *Veile*, the evidence was sufficient to convict him of that charge. As the State argues, there is no variance here between the information and the proof at trial which showed force by physical confinement as discussed above. That there was also positive, direct evidence of the ages of the victim and the accused, which the defendant conceded during closing argument and the jury was instructed as to those ele-

ments without objection by the defendant, does not negate the proof of force shown in the record. To require a reversal, the variance between the proof and the charge " 'must be material and of such character as to mislead the accused in making his defense or expose him to double jeopardy.' " (*People v. Bohm* (1983), 95 Ill. 2d 435, 439, quoting *People v. Johnson* (1976), 65 Ill. 2d 332, 337.) The defendant was neither misled in his defense nor exposed to double jeopardy.

 The defendant's final contention is that the State failed to prove his guilt of the offense of criminal sexual abuse, where evidence of his prior sexual offense conviction—an essential element of its case—was not presented to the trier of fact, the jury. Section 12—15(d) of the Code provides that criminal sexual abuse is a Class A misdemeanor but:

> "A second or subsequent conviction for a violation of subsection (a) of this Section is a Class 2 felony. For purposes of this Section, it is a second or subsequent conviction if the accused has at any time been convicted under this Section or under any similar statute of this State or any other state for any offense involving sexual abuse or sexual assault that is substantially equivalent to or more serious than the sexual abuse prohibited under this Section."

 The State argues the defendant should be estopped from asserting this error, and we agree. The State concedes that, at the time the defendant was tried, a prior offense used to enhance the level of a subsequent conviction was an element of the subsequent offense which was to be pleaded in the charging instrument and proved at trial. (*People v. Hicks* (1987), 119 Ill. 2d 29; *People v. Palmer* (1984), 104 Ill. 2d 340.)[1] However, it contends a defendant may be estopped from challenging on appeal the failure of the State to prove the prior

---

[1] Compare now with Public Act 86—964, amending section 111—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 111—3), effective July 1, 1990, by adding, *inter alia*, subsection (c) as follows: "When the State seeks an enhanced sentence because of a prior conviction, the charge shall also state the intention to seek an enhanced sentence and shall state such prior conviction so as to give notice to the defendant. *However, the fact of such prior conviction and the State's intention to seek an enhanced sentence are not elements of the offense and may not be disclosed to the jury during trial unless otherwise permitted by issues properly raised during such trial.* For the purposes of this Section, 'enchanced sentence' means a sentence which is increased by a prior conviction from one classification of offense to another higher level classification of offense set forth in Section 5—5—1 of the 'Unified Code of Corrections,' approved July 26, 1972, as amended; it does not include an increase in the sentence applied within the same level of classification of offense." (Emphasis added.)

conviction at trial where he agrees to or invites the error. *People v. Hall* (1986), 145 Ill. App. 3d 873; see also *People v. Roberts* (1985), 136 Ill. App. 3d 863, 866-67. But *cf. People v. Nolan* (1989), 188 Ill. App. 3d 251, 257-59 (where the court found the defendant was not estopped from claiming error in the exclusion of the evidence of his prior theft conviction pursuant to his motion *in limine* where the evidence of such conviction was otherwise excludable on the basis that conviction was invalid in that he did not knowingly waive his right to counsel, and where none of the parties in the instant cause were aware that the evidence of the prior theft needed to be presented to the jury).

It is clear from the instant record that the defendant concurred in the plan to withhold from the jury the certified copy of his 1978 conviction of rape in Ogle County. The certified copy of the conviction was offered and accepted into evidence, although not shown to the jury, and the defendant testified at the trial that he had prior felony convictions, although the nature of those convictions was not specified. Counsel and the court were all aware that proof of the prior conviction was an element of the offense to be proved, yet all concurred in not specifying to the jury the nature of the defendant's prior felony conviction of rape.

Under these circumstances, we conclude that defendant is estopped from asserting it was error for the court to do exactly that which he agreed it should do.

For the reasons above, the judgment of the circuit court of Ogle County is affirmed.

Affirmed.

REINHARD and WOODWARD, JJ., concur.