THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH GARTH, Defendant-Appellant.

First District (4th Division)   No. 1—02—3772

Opinion filed September 30, 2004.—Rehearing denied November 9, 2004.

THEIS, J., dissenting.

Michael J. Pelletier and Samuel Algozin, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Lorraine M. Lynott, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a bench trial, defendant Kenneth Garth was convicted of criminal drug conspiracy and sentenced to 12 years in prison. On appeal, defendant argues (1) that the State failed to prove him guilty beyond a reasonable doubt where it failed to establish a sufficient chain of custody showing that the items defendant sold to an undercover agent were the same items the forensic chemist determined to be cocaine; (2) that the State failed to prove him guilty beyond a reasonable doubt where it did not show that defendant entered into an agreement to sell cocaine; (3) that the State improperly introduced inadmissible hearsay testimony; and (4) that the trial court erred in admitting evidence of a separate narcotics transaction involving defendant which was irrelevant and prejudicial. For the following reasons, we affirm. We address the first two issues in this opinion. We address the third and fourth issues in a contemporaneously issued order pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

## I. FACTS

At trial, Agent Ray Espinosa testified that he was an assistant special agent of the United States Department of Housing and Urban

Development (HUD), Office of the Inspector General. On March 7, 2001, he led a task force in conducting an undercover narcotics investigation at the Ogden Courts Public Housing Development, located at 2710 West Ogden Avenue in Chicago. About 6 a.m., Agents Espinosa and Ken Popowicz proceeded to that location with a confidential informant named Bernard Watkins in an undercover vehicle. Agent Espinosa and Watkins entered the rear of the building while Agent Popowicz remained in the vehicle. As Agent Espinosa and Watkins walked up the stairs, they were approached by two individuals who told them to step into the hallway. The men asked, "What's up?" and Espinosa and Watkins told them that they were looking for some "offense," a street term for crack cocaine. Agent Espinosa identified defendant at trial as one of these two men. The other man, later identified as Alonzo Zollicofer, patted down Agent Espinosa and Watkins to search for weapons then told them to enter the stairwell. Agent Espinosa and Watkins were wearing Ryder Truck uniforms and defendant and Zollicofer asked if they could get jobs at that company. Agent Espinosa replied that he would see what he could do and asked for their names. Zollicofer told the agent that his name was "Zo" and defendant responded that his name was "Ken" or "K-dog."

Zollicofer then walked about 10 feet down the hallway and yelled at an unidentified individual for cocaine while defendant stood with Agent Espinosa and Watkins. Defendant asked them if they wanted to purchase heroin and Agent Espinosa and Watkins both replied that they were not interested in heroin, but that they wanted to purchase crack cocaine. While waiting in the hallway, Agent Espinosa saw an unidentified woman walk into the stairwell area and ask defendant for "blows," a street term for heroin. Defendant retrieved a clear plastic baggie from his pocket which held small black baggies each containing a white powder substance. After the unidentified woman gave defendant $10, he handed her one of the small black baggies and she left the building.

Shortly thereafter, another woman, later identified as Rhonda Ford, approached defendant, Agent Espinosa and Watkins in the stairwell area. Defendant told Ford that Agent Espinosa was interested in purchasing 10 bags of crack cocaine and Watkins wanted to purchase 5 bags of crack cocaine. Ford replied that she only had 10 bags of cocaine left. Agent Espinosa responded that he would purchase all 10 bags and split the crack cocaine with Watkins. Defendant stated that would be fine and asked Agent Espinosa for the money. After the agent gave defendant $100, Ford handed him 10 black baggies all containing a "yellowish rock-like substance" and bound in clear plastic tape. Agent Espinosa and Watkins told defendant and Zollicofer that

they would return on Friday of that week, then left the building and drove to a predetermined location for a debriefing with the surveillance and enforcement teams.

Following the debriefing, Agent Espinosa handed the 10 black baggies to Special Agent Falhankel whose duty and responsibility was to hand the evidence over to the agent responsible for inventorying the items, which were then marked "Exhibit No. 7." At trial, Agent Espinosa identified "People's Exhibit No. 1" as the 10 black baggies containing the "yellowish-white powder" and bound in clear plastic tape that he received from Ford on the date in question.

Agent Damien Salvati testified that he was a special agent with HUD's Office of the Inspector General and was working with Agent Espinosa during the long-term undercover drug operation at the Ogden Courts Public Housing Development. After the drug transaction on March 7, 2001, Agent Espinosa provided Agent Salvati with a description of defendant. Based on that description, Agent Salvati searched the Chicago police department "I-cam" photographs for previous arrests made by police in the area near 2710 West Ogden and involving individuals with the nickname "K-dog." Agent Salvati printed defendant's photograph and a few others and presented them to Agent Espinosa in a photographic array on March 12, 2001. Agent Espinosa identified defendant from the photographic lineup, then initialed and wrote the date on the back of defendant's photograph. At trial, Agent Salvati identified "People's Exhibit No. 2-A through E" as the "I-cam" photographs from the police department that he presented to Agent Espinosa in the photographic array.

The parties then stipulated:

"[I]f analyst James DeFrancesco were called to testify, he would be called to testify as an expert in the field of forensic chemistry and so qualified to testify. He would testify he works for the U.S. Department of Justice Drug Enforcement Administration, and that he works at the north central laboratory as a forensic chemist.

He would testify that on May 4, 2001, he removed Exhibit No. 7 from the crime vault at that location. And after using tests and procedures widely accepted in the field of forensic chemistry, it would be his opinion within a reasonable degree of scientific certainty that Exhibit No. 7 contained cocaine. Also, it would be his opinion that after weighing those items on a properly calibrated scale, he determined the net weight of the cocaine to be approximately 1.4 grams with a purity of 84 percent and indicating that the amount of pure drug in Exhibit No. 7 was 1.1 grams. ***

\* \* \*

It is also stipulated that he maintained a proper chain of custody over those items at all times and that the instruments with which

he used to test and examine Exhibit No. 7 were in proper working condition at the time of his tests."

The State then entered People's Exhibit Nos. 1 and 2 into evidence. The parties further stipulated that defendant was arrested by police in October 2001. The defense rested without presenting any evidence.

At trial, the defense focused on the identity of the individual involved in the narcotics transaction. During closing arguments, defense counsel maintained that the evidence was insufficient to prove that defendant was present on the date in question. Defense counsel argued that defendant was not arrested on the date in question and no money or contraband was recovered from his person. Counsel further argued that Agent Espinosa's identification five days after the incident, which was based on photographs of individuals with the same nickname as defendant, was insufficient to show that defendant was the individual involved in the narcotics transaction.

At the conclusion of the trial, defendant was found guilty of criminal drug conspiracy and delivery of a controlled substance. The circuit court merged the delivery of a controlled substance count and defendant was sentenced to 12 years' imprisonment for criminal drug conspiracy. The trial court subsequently denied defendant's motion for a new trial, which alleged, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt. After defendant's motion to reconsider his sentence was denied, defendant then filed this timely appeal.

## II. ANALYSIS

### A. Defendant's Claim That the State Failed to Establish a Proper Chain of Custody

Defendant first argues that the State failed to establish a sufficient chain of custody to demonstrate that the items Agent Espinosa purchased from defendant were the same items tested by the forensic chemist. Defendant contends that without a sufficient chain of custody connecting him to the narcotics, the State failed to prove that the substance delivered to Agent Espinosa was cocaine and, thus, defendant was not proved guilty of criminal drug conspiracy beyond a reasonable doubt. The State first responds that because the chain of custody of the narcotics was not an element of criminal drug conspiracy, defendant's argument must fail.

A person commits criminal drug conspiracy when:

"[W]ith the intent that an offense set forth in Section 401, Section 402, or Section 407 of this Act be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit such an offense unless an act in

furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator." 720 ILCS 570/405.1(a) (West 2000).

See also *People v. Edwards*, 337 Ill. App. 3d 912, 922 (2002). Thus, the State was required to allege and prove that: (1) defendant agreed with another to commit an offense set forth in section 401, 402 or 407 with the intent to commit that offense; and (2) defendant or a coconspirator committed an act in furtherance of this agreement. 720 ILCS 570/405.1(a) (West 2000). In this case, the indictment alleged that, with the intent that the offense of delivery of a controlled substance be committed, defendant conspired with several other people to commit this offense by engaging in street sales of cocaine and heroin and in furtherance of the conspiracy, defendant committed the following act:

"On March 7, 2001, at approximately 6:18 a.m., at 2710 West Ogden Avenue, Alonzo Zollicofer, Rhonda Ford, and Kenneth Garth delivered ten packets containing 1.4 gram[s] of cocaine to an undercover officer in exchange for $100.00 United States currency."

Under the second element of this offense, the State was required to prove that defendant committed an act in furtherance of the conspiracy as alleged in the indictment, *i.e.*, that defendant delivered 1.4 grams of cocaine to an undercover officer. In order to prove that defendant committed this act, the State obviously had to prove that what defendant sold to the officer was, in fact, 1.4 grams of cocaine. In doing so, the State had to establish a sufficient chain of custody to connect the items that Agent Espinosa purchased from defendant to the items determined to be cocaine by the forensic chemist.

The State relies on *United States v. Russell*, 109 F.3d 1503 (10th Cir. 1997), to support its contention that proof of the chain of custody is not necessary to support a criminal drug conspiracy conviction. In *Russell*, it was uncontested that the police found 18 grams of cocaine along with drug paraphernalia and $400 in a codefendant's bedroom. Additionally, an informant testified that the defendant showed him a one-ounce rock of cocaine. *Russell*, 109 F.3d at 1506. At trial, the prosecution linked the defendant to the codefendant and the stash of cocaine. The court did not hold that a chain of custody was never required in drug conspiracy cases, but instead found that the existence of two cocaine stashes and the relationship between the defendant and the codefendant was enough to establish the conspiracy. *Russell*, 109 F.3d at 1506. In *Russell*, while the prosecution did not have to show that the drugs seen in the defendant's hand were the same drugs found in the bedroom, it did have to prove that the substance was a narcotic and that the defendant was connected to those drugs. Similarly, based on the wording of the indictment in this case, the

State was required to prove that defendant delivered cocaine to Agent Espinosa as an element of the offense of criminal drug conspiracy. We therefore reject the State's argument that proof of the chain of custody was not necessary to sustain defendant's conviction.

Defendant contends that the State failed to establish a proper chain of custody to show that the items defendant sold to Agent Espinosa were the same items that the forensic chemist determined to be cocaine because (1) a discrepancy existed as to the exhibit numbers used to identify the items; (2) the agent responsible for inventorying the items never testified regarding the handling and safekeeping of the evidence; (3) the stipulated testimony failed to include a description of the evidence and whether the forensic chemist received it in a sealed condition; and (4) the stipulated testimony was limited to the time during which the items were in the custody of the forensic scientist.

■ Before the circuit court may admit real evidence at trial, the State must provide an adequate foundation either by way of live testimony or a stipulation that establishes that the item sought to be admitted is the actual item involved in the alleged offense and that the item's condition is substantially unchanged. *People v. Fox*, 337 Ill. App. 3d 477, 481 (2003). If an item is not readily identifiable or if it is susceptible to alteration by tampering or contamination, the State must establish its chain of custody with sufficient completeness to render it improbable that the original item has either been exchanged, contaminated, or subjected to tampering. *Fox*, 337 Ill. App. 3d at 481.

Unless the defendant produces actual evidence of tampering, substitution, or contamination, the State need only establish a probability that tampering, substitution, or contamination did not occur, and any deficiencies go to the weight rather than the admissibility of the evidence. *People v. Herrero*, 324 Ill. App. 3d 876, 882 (2001).

The purpose of protective measures is to ensure that the substance recovered from the defendant was the same as the substance tested by the forensic chemist. *People v. Ryan*, 129 Ill. App. 3d 915, 919 (1984). Proof of delivery, presence, and safekeeping demonstrates that reasonable measures were taken to protect the evidence. *Fox*, 337 Ill. App. 3d at 482. The State is not required to exclude every possibility of tampering, nor does it need to present every individual involved in the chain of custody. *Fox*, 337 Ill. App. 3d at 482.

■ In this case, we find that the State proved the chain of custody with sufficient completeness to establish that the 10 black baggies purchased by Agent Espinosa were the same items that tested positive for cocaine. In so concluding, we reject defendant's first contention that a discrepancy exists as to the exhibit number attached to the

evidence at the time Agent Espinosa purchased the suspected contraband and the exhibit number of the evidence that he identified at trial. Agent Espinosa testified that after he gave defendant $100, Ford handed him 10 black baggies all containing a "yellowish rock-like substance" and bound in clear plastic tape. Agent Espinosa then gave these items to Agent Falhankel to be inventoried, and they were marked "Exhibit No. 7." The parties further stipulated that the forensic chemist removed "Exhibit No. 7" from the crime vault at his laboratory and determined that "Exhibit No. 7" contained cocaine. At trial, the State introduced "People's Exhibit No. 1," which Agent Espinosa identified as the 10 black baggies containing the "yellowish-white powder" and bound in clear plastic tape that he received from Ford on the date in question. The testimony at trial is as follows:

"Q. Once you related that to Mr. Garth and Miss Ford, what occurred?

A. Mr. Garth said that was fine. He asked for the money, which I then tendered $100 USC to Mr. Garth; and then turned to Miss Ford, and she tendered ten black ziplock baggies all containing a yellowish rock-like substance and they were bound in like a clear plastic tape, masking tape type thing.

* * *

By Mr. Hughes:

Q. Showing you People's Exhibit No. 1 for identification purposes and ask you if you recognize that exhibit? And if so, would you please tell the court what that is?

A. Yes. These are the ten ziplock baggies again bound in the clear plastic tape that I purchased from the defendant.

Q. And do the baggies have any colored tint to them?

A. Yes, it is a yellowish-white powder. It looks like it has been smashed up.

Q. The baggies, do they have any tint?

A. I'm sorry, the baggies are black, yes.

Q. Do these objects appear to be the same objects that you received from Rhonda Ford on March 7, 2001 or at approximately 6:15 a.m.?

A. Yes.

* * *

Q. After you conducted a debriefing what did you do with respect to these ten ziplock black tinted plastic baggies?

A. I handed them over to Special Agent Falhankel, and he basically took custody of the evidence at that time.

Q. Was it his duty and responsibility to then hand that over to the agent that is responsible for inventorying those items?

A. That is correct.

Q. Are those items marked Exhibit No. 7?

A. Yes."

While Agent Espinosa identified the evidence as being marked "Exhibit No. 7" for inventory purposes and the parties stipulated that the chemist tested the evidence identified as "Exhibit No. 7," the State admitted the evidence at trial as "People's Exhibit No. 1" and Agent Espinosa identified "People's Exhibit No. 1" as the same items he received from Ford that were marked "Exhibit No. 7." We therefore find that the different exhibit numbers used to identify the evidence do not provide a basis for this court to hold that the chain of custody was insufficient in the instant case.

We also reject defendant's second and third claimed defects with respect to the chain of custody and the stipulated evidence, *i.e.*, that the agent responsible for inventorying the items purchased by Agent Espinosa never testified and the stipulated testimony failed to include a description of the evidence and whether the forensic chemist received it in a sealed condition. In reaching this conclusion, we have considered several recent cases that are on point with the challenge in the instant case.

In *People v. Durgan*, 346 Ill. App. 3d 1121 (2004), the defendant was charged with possession of a controlled substance and the parties stipulated at trial to the forensic chemist's testimony. On appeal, the defendant argued that the stipulated testimony did not show what tests the chemist performed, whether those tests were "commonly used in the area of forensic chemistry," how the chemist recorded her findings, and whether the equipment she used to test the substance was functioning properly, and, therefore, the State failed to present sufficient evidence that the substance recovered from the defendant was cocaine. *Durgan*, 346 Ill. App. 3d at 1130. In *Durgan*, the Fourth District rejected the defendant's argument, relying on *People v. Hill*, 345 Ill. App. 3d 620 (2003). In *Hill*, this court addressed the defendant's foundational challenge to an expert's testimony, to which the defendant had stipulated. In *Hill*, we held that when a defendant stipulates to an expert's opinion, he forfeits his right to challenge on appeal the foundation for the expert's opinion. *Hill*, 345 Ill. App. 3d at 630. In so holding, this court reasoned that a defendant forfeits any issue as to the impropriety of evidence if he procures, invites or acquiesces in the admission of that evidence. *Hill*, 345 Ill. App. 3d at 631. In *Hill*, this court also stated:

"[S]everal characteristics unique to stipulations further support our holding. First, had defendant made a timely objection at trial and not agreed to the State's stipulation, the trial court could have

addressed this foundational issue and the State could have corrected the deficiency. [Citation.] By presenting the chemist's testimony through a stipulation, in a brief and summary fashion, the result was to remove from the case any issue concerning the expert's testimony. [Citations.] Additionally, the State likely would not have agreed to the stipulated testimony, thereby foregoing the opportunity to place the expert on the witness stand and ask him to describe in detail the number and type of tests performed on the substance, if the stipulation was not intended to eliminate the need for defending his testimony against a challenge by defendant. [Citation.] Further, we assume that defense counsel, by agreeing to the stipulation, decided to forego the opportunity to cross-examine the expert to focus on other theories and aspects of the defense." *Hill*, 345 Ill. App. 3d at 632.

The *Durgan* court agreed with the rationale and holding in *Hill*. The *Durgan* court further noted:

"[B]y stipulating to a fact—for example, as in this case, that the substance tested was cocaine—the parties dispense with the need to further stipulate to the foundation underlying that fact. In other words, because a stipulation is a substitute for the witness's actual testimony, all of those matters that the witness could have and should have testified about are encompassed by the stipulation." *Durgan*, 346 Ill. App. 3d at 1131-32.

The *Durgan* court concluded that because the defendant stipulated that the substance recovered from him contained 1.8 grams of cocaine, he could not challenge the foundation for the expert's testimony on appeal. *Durgan*, 346 Ill. App. 3d at 1132.

Similarly, in *People v. Besz*, 345 Ill. App. 3d 50 (2003), the defendant was charged with possession of a controlled substance and stipulated to the forensic chemist's testimony. On appeal, the defendant claimed that the State failed to lay the proper technical foundation for the testimony and that the State failed to prove the existence of an adequate chain of custody between the substance recovered at the apartment and that which the laboratory determined to be cocaine. *Besz*, 345 Ill. App. 3d at 51. In rejecting defendant's foundational challenge to the expert's testimony, this court relied on the holding in *People v. Bynum*, 257 Ill. App. 3d 502, 514 (1994), which required a defendant to make a specific trial objection to the expert's testimony on the grounds of insufficient foundation in order to preserve the issue for review. In *Besz*, this court stated:

"We find that this rule is even better suited to apply in situations, such as in the instant case, where the defendant not only failed to raise an objection during live testimony but *actually took part in the offering of the testimony through stipulation*." (Emphasis in original). *Besz*, 345 Ill. App. 3d at 55.

In *Besz*, we further stated:

"If we were to allow defendant to object to the admission of the stipulation for the first time on appeal, such would amount to our condonation of a party's attempt to inject error into the record. See *People v. Gacy*, 103 Ill. 2d 1, 74 (1984)." *Besz*, 345 Ill. App. 3d at 57.

As such, this court stated:

"[W]here a defendant offers to stipulate to the admission of an expert's testimony without raising an objection as to whether the proper foundation for the testimony had been laid, then later relies on that testimony as part of his defense, the defendant may not raise the issue for the first time on appeal." *Besz*, 345 Ill. App. 3d at 57.

In this case, defendant attempts to circumvent the waiver rule by characterizing the challenge as an attack on the sufficiency of the evidence, rather than its admissibility. This court has previously rejected this precise argument. See *Besz*, 345 Ill. App. 3d at 54-55; *People v. DeLuna*, 334 Ill. App. 3d 1, 20 (2002). More particularly, this division of the appellate court has adhered to the holdings of *DeLuna* and *Besz* that a defendant's challenge to the foundation for an expert's stipulated opinion is an issue of admissibility of the evidence, not sufficiency of the evidence, as defendant suggests. *Hill*, 345 Ill. App. 3d at 633. In so finding, we decline to follow the holdings in *People v. Rucker*, 346 Ill. App. 3d 873 (2003), and *People v. Washington*, 343 Ill. App. 3d 889 (2003), that a defendant's challenge to an expert's stipulated testimony is an attack on the sufficiency of the evidence and, therefore, the issue can be raised for the first time on appeal. *Hill*, 345 Ill. App. 3d at 633. We find no reason to depart from our decision in *Hill* and conclude that defendant cannot raise this issue for the first time on appeal.

Our supreme court has very recently addressed this same issue in *People v. Harvey*, 211 Ill. 2d 368, 385-86 (2004), where the court stated:

"This court has acknowledged *** that a defendant's invitation or agreement to the procedure later challenged on appeal 'goes beyond mere waiver.' *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001). Indeed, Illinois courts sometimes refer to the issue as one of estoppel. See, *e.g.*, *People v. Burage*, 23 Ill. 2d 280, 283 (1961); *People v. Sparks*, 314 Ill. App. 3d 268, 272 (2000); *People v. Satter-field*, 195 Ill. App. 3d 1087, 1100-01 (1990); *People v. Reed*, 51 Ill. App. 3d 479, 482 (1977). That is, '[u]nder the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' *People v. Carter*, 208 Ill. 2d 309, 319 (2003), citing *Villarreal*, 198 Ill. 2d at 227-28; *People v. Segoviano*, 189 Ill. 2d 228, 240-41 (2000);

*People v. Lowe*, 153 Ill. 2d 195, 199 (1992). To permit a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal 'would offend all notions of fair play' (*Villarreal*, 198 Ill. 2d at 227), and 'encourage defendants to become duplicitous' (*Sparks*, 314 Ill. App. 3d at 272).

Illinois courts have applied the invited error doctrine in numerous cases to bar a defendant from claiming error in the admission of improper evidence where the admission was procured or invited by the defendant. *E.g.*, *People v. Caffey*, 205 Ill. 2d 52, 114 (2001); *People v. Payne*, 98 Ill. 2d 45, 49-50 (1983); *People v. Abdullah*, 336 Ill. App. 3d 940, 950 (2002); *People v. Bridges*, 273 Ill. App. 3d 773, 779 (1995)." *Harvey*, 211 Ill. 2d at 385-86.

As in *Besz* and *Hill*, the instant defendant, through trial counsel, intended to stipulate to the weight and identity of the cocaine in order to develop a defense theory of identification. Also as in *Besz* and *Hill*, the defendant, through appellate counsel, now contends that this course of action resulted in the improper admission of evidence. This disingenuous argument is exactly the type that was so recently condemned by our supreme court in *Harvey*. Consequently, we reject it.

In *Besz*, we also rejected the defendant's second argument on appeal as to the adequacy of the chain of custody where the trial record was replete with instances of defense counsel indicating that the cocaine at issue was indeed in the apartment. In doing so, this court relied on the holding in *People v. Johnson*, 334 Ill. App. 3d 666 (2002). The *Johnson* court determined that where defense counsel conceded the ultimate issue of the identity of the controlled substance recovered as evidence in the case, defendant had forfeited the right to raise a foundation argument on appeal. *Johnson*, 334 Ill. App. 3d at 680. Similarly, this court found the defendant in *Besz* was estopped from arguing on appeal that there was insufficient evidence to establish the identity of the substance at issue as cocaine where defense counsel conceded this ultimate fact at trial. *Besz*, 345 Ill. App. 3d at 58.

In this case, Agent Espinosa testified that after he gave defendant $100, Ford handed him 10 black baggies all containing a "yellowish rock-like substance" and bound in clear plastic tape. Agent Espinosa then gave these items to Agent Falhankel to be inventoried and they were then marked "Exhibit No. 7." The parties stipulated that not only would the chemist "testify as an expert in the field of forensic chemistry," but also that he "removed Exhibit No. 7 from the crime vault" and "after using tests and procedures widely accepted in the field of forensic chemistry, it would be his opinion within a reasonable degree of scientific certainty that Exhibit No. 7 contained cocaine ***

and after weighing those items on a properly calibrated scale, he determined the net weight of the cocaine to be approximately 1.4 grams." The parties further stipulated that "he maintained a proper chain of custody over those items at all times" and that "the instruments with which he used to test and examine Exhibit No. 7 were in proper working condition at the time of his tests."

Based on the strength of these agreed facts, it was reasonable and fair for the trier of fact to conclude that the items purchased by Agent Espinosa contained cocaine. The parties stipulated not only to a proper chain of custody but also to an adequate foundation for the chemist's determination that "Exhibit No. 7" contained 1.4 grams of cocaine. Also, Agent Espinosa's identification of "People's Exhibit No. 1" as being the items that he purchased, and which were marked "Exhibit No. 7," was consistent with the items tested by the chemist.

In this case, the weight and composition of the drugs are not discussed anywhere but in the stipulated testimony. Defense counsel instead argued that the evidence was insufficient to prove that defendant was present during the narcotics transaction. We therefore find that defendant intended to stipulate to the weight and identity of the cocaine in this case in order to develop a defense theory regarding the identity of the perpetrator. *Besz*, 345 Ill. App. 3d at 56. By agreeing to the stipulation regarding the chemist's qualifications, the chain of custody and the weight and chemical composition of the suspect materials, the parties effectively removed these issues from the case. *Hill*, 345 Ill. App. 3d at 632. Accordingly, defendant has waived this issue where he agreed to the procedure that he now seeks to challenge on appeal. *Harvey*, 211 Ill. 2d at 385-86.

We also reject defendant's argument that the parties' stipulation that a proper chain of custody was maintained "at all times" should not be interpreted to mean literally "at all times" but rather limited to the time during which the items were in the custody of the chemist. In support of this argument, defendant points out that the language in question was contained within the stipulation as to the chemist's testimony and that he could not testify that a proper chain of custody was maintained prior to his receipt of the items. This is not a challenge to the sufficiency of the evidence but rather a challenge to the stipulation. If it had not been the intent of the parties to stipulate to the chain of custody, it would have been in their best interests not to agree to the stipulation. In the context of this case, where no issue was raised as to the identity of the substance as cocaine, it is reasonable to conclude that the parties intended to remove this issue from the case. *Besz*, 345 Ill. App. 3d at 56. Under these circumstances, we find the evidence sufficient to permit the trial court to find beyond a

reasonable doubt that the items purchased by Agent Espinosa were cocaine. *Besz*, 345 Ill. App. 3d at 59.

## B. Defendant's Claim That the State Failed to Prove the Existence of an Agreement to Engage in the Sale of Cocaine

■ Defendant next argues that the State failed to prove him guilty of criminal drug conspiracy beyond a reasonable doubt where it failed to prove that he entered into an agreement with either Zollicofer or Ford to sell cocaine to Agent Espinosa.

To establish a *prima facie* case of conspiracy, the State must prove that two or more persons intended to commit a crime, that they engaged in a common plan to accomplish the criminal goal and that an act or acts were done by one or more of them in furtherance of the conspiracy. *People v. Melgoza*, 231 Ill. App. 3d 510, 521 (1992). Mere knowledge of or acquiescence in an illegal act neither constitutes conspiracy nor suffices to give rise to an inference of conspiracy. *People v. Testa*, 261 Ill. App. 3d 1025, 1027-28 (1994). Defendant argues that the mere fact that he was present and participated in the alleged cocaine transaction is insufficient to prove that he was involved in a conspiracy to sell cocaine.

The existence of an agreement between coconspirators to do a criminal act may be inferred from all of the surrounding facts and circumstances, including the acts and declarations of the accused. *Melgoza*, 231 Ill. App. 3d at 521. Because of the clandestine nature of conspiracy, the courts have permitted broad inferences to be drawn from the circumstances, acts and conduct of the parties. *Melgoza*, 231 Ill. App. 3d at 523. In this case, there is no direct evidence of an agreement between defendant and Zollicofer or Ford to commit a crime. Consequently, we must determine if there was sufficient circumstantial evidence from which such an agreement could be inferred.

The State's evidence showed that Agent Espinosa communicated his wish to purchase cocaine to defendant and Zollicofer. Zollicofer walked down the hallway and yelled for an unidentified individual to bring them cocaine. Defendant remained with Agent Espinosa and informant Watkins in the stairwell area. Shortly thereafter, Ford approached and defendant informed her that Agent Espinosa wanted to purchase 10 bags of crack cocaine and Watkins wanted to purchase 5 bags of crack cocaine. When Ford replied that she only had 10 bags of cocaine left, Agent Espinosa responded that he would purchase all 10 bags and split the crack cocaine with Watkins. Defendant responded that would be fine and asked Agent Espinosa for the money. After the agent gave defendant $100, Ford handed him the 10 bags of cocaine.

In our view, these collective facts and circumstances are sufficient to support the inference that defendant had entered into an agreement to sell the cocaine. After making contact with the buyers, Agent Espinosa and Watkins, Zollicofer arranged the sale by instructing an individual nearby to bring cocaine while defendant completed the deal by taking the money and instructing Ford regarding the amount of cocaine to be tendered.

Defendant cites *People v. Darnell*, 214 Ill. App. 3d 345 (1990), and *People v. Deatherage*, 122 Ill. App. 3d 620 (1984), in support of his position that the evidence was insufficient to prove him guilty beyond a reasonable doubt. In those cases, the defendants were found guilty of delivery of a controlled substance based on a theory of accountability. The appellate court reversed the convictions, finding insufficient evidence that the defendants aided, abetted or attempted to aid others in the perpetration of the crimes of delivery. The court found that there was no evidence of an agreement to commit the crime or evidence that the defendants knew that the crimes were being committed. The courts concluded that the defendants' mere presence at the scene of the crime was insufficient proof of guilt and that they could have been innocent bystanders. In contrast to *Darnell* and *Deatherage*, defendant in the instant case was involved in the transaction itself where he accepted the money and instructed Ford regarding the amount of cocaine to be purchased by Agent Espinosa. Unlike in *Darnell* and *Deatherage*, the conduct and actions of defendant here circumstantially establish his knowledge of the cocaine and his agreement to sell that cocaine.

We are also not persuaded by defendant's reliance on *Burley v. Florida*, 526 So. 2d 1021 (Fla. App. 1988), and *United States v. Ramos*, 613 F. Supp. 115 (S.D.N.Y. 1985), in support of his argument that the State failed to prove the existence of a conspiracy. In *Burley*, the Florida Court of Appeals reversed the defendant's conviction for conspiracy to deliver cocaine. The evidence in that case showed that an informant walked up to the defendant and asked him if he was selling cocaine. The defendant responded "no" and took him to an individual named Gray. The informant handed money to the defendant, who handed it to Gray. Gray then handed cocaine to the defendant, who handed it to the informant. The court noted that there was no proof of any prearrangement, prior discussions or plans made in preparation for the narcotics transaction. The court also determined that there was no proof that the defendant and Gray conspired together to commit the crime or did anything other than engage in the single transaction. Unlike *Burley*, the defendant's actions in this case were not limited to merely passing drugs and money between the

buyer and seller in a narcotics transaction. Rather, defendant in this case not only agreed to Agent Espinosa's request to purchase cocaine, but personally accepted the money and informed Ford as to the amount of cocaine the agent sought to purchase.

In *Ramos*, the federal district court reversed the defendant's conviction for conspiracy to distribute cocaine. The evidence in that case showed that the defendant approached an undercover police officer and asked him if he wanted heroin or cocaine. The officer asked for cocaine and walked down the street with the defendant. The defendant then approached an unidentified individual and asked him for cocaine, but that individual informed him that he had just run out of cocaine and suggested that he try another address. When the defendant and the officer walked to that address, the defendant asked a second unidentified individual for cocaine. That individual asked the defendant if he had money and the defendant turned to the officer, who handed him $20. The defendant then walked down the street with the unidentified individual and handed him the $20. The defendant walked back to the officer, handed him one foil packet of cocaine and explained that the seller left to get another packet of cocaine. Shortly thereafter, the unidentified individual returned, placed a packet on a car and directed defendant to it. The defendant retrieved the packet and handed it to the officer. The *Ramos* court determined that the defendant was not proved guilty beyond a reasonable doubt of the charge of conspiracy to distribute cocaine where the evidence could support a finding that the defendant was simply a scavenger seeking out willing purchasers and then seeking out willing sellers in the hope of gaining some financial reward from one or the other. Unlike *Ramos*, defendant's actions in this case did not suggest that he was a scavenger. In contrast to *Ramos*, defendant's actions circumstantially established that he had an agreement to sell the cocaine where he informed Ford regarding the purchase of the cocaine, agreed to the transaction and personally collected the money.

In sum, we find that the facts and circumstances of this case are sufficient to support the inference that defendant entered into an agreement to sell the cocaine. Thus, we cannot say that defendant's conviction was based on evidence that was so unreasonable, improbable or unsatisfactory that it created a reasonable doubt of defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

## C. Defendant's Claim That the State Introduced Inadmissible Hearsay Testimony

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

## D. Defendant's Claim that the Trial Court Improperly Admitted Evidence of Defendant's Involvement in a Separate Narcotics Transaction

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN, J., concurs.

JUSTICE THEIS, dissenting:

In this case, the majority finds that the chain of custody was sufficient. I disagree and dissent.

Defendant argues that the State failed to establish a proper chain of custody to show that the items defendant sold to Agent Espinosa were the same items that the forensic chemist determined to be cocaine for four different reasons outlined by the majority above. I need address only the first of these arguments. In that argument, defendant contends that a discrepancy existed as to the exhibit numbers used to identify the items, rendering the chain of custody insufficient. I agree with the majority that this specific issue should be addressed under a sufficiency of the evidence analysis, but find that, based on this record, the evidence was insufficient.

When introducing contraband, the State has the burden to establish a chain of custody of sufficient completeness to render it improbable that the evidence has been tampered with, exchanged, or contaminated. *People v. Harris*, 352 Ill. App. 3d 63 (2004). In the absence of actual evidence of tampering, substitution, or contamination, the State satisfies its burden by showing that reasonable measures were used to protect the evidence from the time that it was seized and that it was improbable that the evidence was altered. *Harris*, 352 Ill. App. 3d at 68-69. The purpose of these protective measures is to ensure that the substance recovered from the defendant was the same as the substance tested by the forensic chemist. *Fox*, 337 Ill. App. 3d at 481-82. However, the State is not required to exclude all possibilities of tampering nor does the State need to call everyone involved in the chain of custody to testify. *Fox*, 337 Ill. App. 3d at 482; *People v. Irpino*, 122 Ill. App. 3d 767, 775 (1984). Accordingly, even if there is a missing link in the chain of custody, evidence may be

properly admitted if there is testimony sufficiently describing the condition of the evidence when delivered which matches the description of the evidence when examined. *Harris*, 352 Ill. App. 3d at 69.

I disagree with the majority and would find that the State failed to prove the chain of custody with sufficient completeness to establish that the 10 black baggies purchased by Agent Espinosa from defendant were the same items that tested positive for cocaine. Agent Espinosa testified that he purchased from Ford and defendant "ten black ziplock baggies all containing a yellowish rock-like substance" bound with clear plastic tape, which he identified as "People's Exhibit No. 1." He then handed the bags to Agent Falhankel, who was responsible for handing them over to another agent who would inventory those items, which were marked "Exhibit No. 7."

However, the stipulation provided only that DeFrancesco would testify that he tested Exhibit No. 7 and determined that it contained 1.4 grams of cocaine. The stipulation never mentioned People's Exhibit No. 1. The State later admitted only Exhibit Nos. 1 and 2 into evidence. There is no clear evidence in the record that the items recovered by defendant were referred to as both People's Exhibit No. 1 and Exhibit No. 7 at trial. Contrary to the majority's statement, Agent Espinosa never identified the evidence as being marked Exhibit No. 7 only for inventory purposes and did not explain that People's Exhibit No. 1 contained the same items he received from Ford that were marked Exhibit No. 7. Further, it is mere supposition to conclude, as the majority does, that the State admitted the evidence recovered from defendant as People's Exhibit No. 1 when the stipulation stated only that Exhibit No. 7 contained cocaine.[1]

Moreover, in addition to the contradictory exhibit numbers, there was no matching description of the evidence recovered by Agent Espinosa and the evidence analyzed by the chemist to establish that the evidence was the same. Neither Agent Espinosa's testimony nor the stipulation reference an inventory number given to the evidence recovered and tested. Additionally, neither his testimony nor the stipulation explained the condition of the evidence. Further, while Agent Espinosa described the evidence he recovered with some detail, the stipulation did not contain any description of the item tested or even the number of items tested. Lastly, the State never admitted Exhibit No. 7 into evidence.

Here, there is no testimony sufficiently describing the condition of the evidence when delivered which matches the description of the

---

[1] I also note that the State never acknowledges this contradiction in the testimony in its brief and offers no explanation for this discrepancy.

evidence when examined. Thus, I would find that the State failed to connect the evidence recovered from defendant with the evidence tested by the chemist in this case. By failing to establish a sufficient chain of custody of the cocaine under these facts, the State failed to prove that defendant delivered cocaine to an undercover agent. Based on this fatal flaw in the chain of custody, I would find that the State failed to prove defendant guilty beyond a reasonable doubt of criminal drug conspiracy and reverse his conviction.

For the reasons stated, I respectfully dissent.